PITTSBURGH PLATE GLASS CO. ET AL., APPELLANTS, *v.* BOWERS, TAX COMMR., APPELLEE.

(No. 5509—Decided November 19, 1956.)

*Mr. George P. Cheney, Mr. Robert l. Kiegsley, Mr. Leland Hazard, Mr. Ferd M. Pickens* and *Mr. Robert Dow Hamilton,* for appellants.

*Mr. C. William O'Neill,* attorney general, *Mr. William E. Herron* and *Mr. Kiehner Johnson,* for appellee.

HORNBECK, J. This is an appeal from a decision of the Board of Tax Appeals affirming an order of the Tax Commissioner assessing certain use taxes against the appellants.

Fortunately, the parties have by stipulation agreed not only upon the items upon which the tax was assessed, but also upon the specific legal question presented for determination before the Tax Commissioner and the Board of Tax Appeals on review. Our course is charted by Section 5717.04, Revised Code. The test which we are to apply is whether the decision of the board from which the appeal is taken is reasonable and lawful.

The parties stipulate that "the primary question of law in the above cases presented to the Board of Tax Appeals * * * is whether the appellants are engaged in mining for sale."

We shall not attempt to set out in detail the amount of the tax or the figures representative of the sales and shipment of coal from what is known as the Midvale mine, but accept these detailed amounts, as set forth in the opinion of the majority of the Board of Tax Appeals.

At the outset we state that, in our judgment, the opinion of the minority member of the board is more reasonable than that of the majority and more properly conforms to the correct finding, namely, that the appellants are exempt from the tax assessed.

For the periods involved in the audit, the operations were conducted by the Pittsburgh Plate Glass Company or its subsidiary, Columbia-Southern Chemical Corporation. They are from November 10, 1948, to April 24, 1951, and from April 24, 1951, until June 30, 1952. It appears that in 1951 appellant company transferred the assets of the Midvale mine to Columbia-Southern Chemical Corporation. As said in the majority opinion "for all practical purposes the Midvale coal mine operation and the purchase of materials and equipment to operate the mine can be considered as a continuing operation having been under the same management at all times."

The issue is whether the items of tangible personal property presented by appellants, upon which the tax was assessed, were used directly in mining coal for sale. If so, they are exempt from taxation.

The Columbia-Southern Chemical Corporation operates a

plant at Barberton, for manufacturing chemicals, which uses a great amount of slack coal, from 20,000 to 25,000 tons per month. About 50 per cent of this coal, during the periods involved, was purchased by transfer from appellants' Midvale mine. The Columbia-Southern Chemical Corporation attempted to secure the best purchase price for this coal sold to the Barberton plant but it is fixed by the general office at Pittsburgh. It appears that the production of slack in deep mines is not, except in rare cases, a profitable venture. There is no showing that there was any shortage in the supply of slack.

Over the periods involved, appellants, on a dollar value basis of coal produced and sold or transferred, sold on the open market 54 per cent and shipped to Barbertan 46 per cent. Upon the tonnage basis, during the same period, they sold on the open market 47.8 per cent and shipped to Barberton 52.2 per cent. Of course, it was beneficial to Barberton to have a supply of slack near its plant and to a lesser degree to the Midvale mine to have an assured outlet for much of its slack.

The majority of the board gave considerable weight to the testimony of Paul C. Beutel, manager of the Columbus division of the Columbia-Southern Chemical Corporation, and manager of the Midvale mine, who said that, in his opinion, "it is my understanding that that mine was purchased to assure the Barberton plant of a uniform and continuing supply of coal." However, the witness qualified his answer by stating that he was not on the board of directors and not an officer of the company. So that, his understanding in no wise could be accepted as probative of the purpose of the appellants in acquiring the mine. Beutel's testimony was not disputed in any particular and the gist of it is clear, that soon after the acquisition of the mine every effort was made to increase the production of the higher grades of coal with the intention of making the operation of the mine a profitable venture. He testified that the very finest equipment necessary to the mining and production of the finer grades of coal for the commercial market had been installed in the mine; that the method of blasting the coal had been completely changed, an explosive known as Cardox and an expert in its use employed which assisted in procuring more of the larger lump coal. He said that the mine not only competed in the market for the sale of the better grades of coal, set up its

sales force, but attempted to and did sell much of the output of slack in the open market. He said that the cost of the machinery, the use of which was made necessary only by reason of the mining of commercial grades of coal, was of the value of $260,000 and if it was the purpose to produce only slack the cost of the machinery needed would be approximately $25,000. The slack coal has been reduced in size since the mine was taken over from $1\frac{3}{8}$ to $\frac{3}{8}$ of an inch.

Without further comment on the evidence, the tenor and effect of all of it is that the principal purpose in the operation of the Midvale mine, during the periods involved in the audit, was to better prepare to compete for the business in the commercial market and to produce a profit in the sale of the higher grades of coal and that the furnishing of slack to Barberton was only an incidental operation. The practice in the operation of the mine during the time subsequent to those periods immediately involved was admissible as it reflected on the general purpose of the appellants to mine coal for sale.

It is therefore our judgment that the decision of the Board of Tax Appeals on the facts developed is unreasonable and should be reversed.

Some comment was made at the time of the oral presentation of the case concerning the order which this court should make if it held with the contention of the appellants. The statute, Section 5717.04, Revised Code, reads in part:

"If upon hearing and consideration of such record and evidence the court decides that the decision of the board appealed from is reasonable and lawful it shall affirm the same, but if the court decides that such decision of the board is unreasonable or unlawful, the court shall reverse and vacate the decision or modify it and enter final judgment in accordance with such modification."

Our order is not a modification of the order of the Tax Commissioner and the Board of Tax Appeals, but a reversal of its decision.

The decision of the Board of Tax Appeals is reversed and vacated.

*Decision reversed.*

MILLER, P. J., and WISEMAN, J., concur.