TIMKEN COMPANY, APPELLANT, *v.* LINDLEY, TAX COMMR., APPELLEE.

182

(No. CA-6621—Decided
October 21, 1985.)

*Day, Ketterer, Raley, Wright & Rybold* and *John F. Buchman,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *James C. Sauer,* for appellee.

PUTMAN, P.J. Appellant, the Timken Company, appeals from a decision of the Ohio Board of Tax Appeals. In its decision, the board modified in some respects a final order of the Tax Commissioner dated May 11, 1982, which in turn had affirmed, as modified, an assessment of sales and use taxes resulting from an audit covering the period from January 1, 1975 through December 31, 1977. Appellant's appeal is based on five assignments of error:

"I. The Board of Tax Appeals erred in its determination that certain items of tangible personal property were not purchased by Timken for use directly in the production of tangible personal property for sale and were therefore not excepted from sales tax as provided in Section 5739.01(E)(2), Revised Code.

"II. The Board of Tax Appeals erred in its determination that the testimony of one of Timken's witnesses concerning the use of certain items by Timken was of no probative value to show that such items were purchased by Timken for use directly in the production of tangible personal property for sale.

"III. The board erred in its determination that certain payments made by Timken for labor for the installation of items of tangible personal property were subject to sales tax as part of the 'price' of such tangible personal property under Section 5739.01(H), Revised Code.

"IV. The Board of Tax Appeals erred in its determination that items purchased by Timken for use in the repair or maintenance of other machinery and equipment being used by Timken directly in the production of tangible personal property for sale were subject to sales tax and not excepted therefrom under Section 5739.01(E)(2), Revised Code, and in failing to give any effect whatsoever to Rule 5703-9-21(M), promulgated by the Department of Taxation, in making such determination.

"V. The Board of Tax Appeals erred in determining that certain transactions in which engineering services were rendered to and paid for by Timken constituted the purchase of tangible personal property rather than personal service transactions in which any transfer of tangible personal property was an inconsequential element, as provided in Section 5739.01(B), Revised Code."

Because we find the board's decision unreasonable and unlawful, we sustain appellant's assignments of error and reverse the board's decision.

## Background

The taxpayer-appellant is a corpora-

tion engaged in the manufacturing of steel and steel products, including mechanical tubing, steel bars and bearings. Some of the tubing is sold outright as a product, while part of it is used in the manufacturing of bearings. With respect to the manufacture of steel itself, the continuous casting operation involves the pouring of molten steel into a series of molds, making several strands at one time. A tundish distributes the molten steel to each of the molds. As the steel cools, it goes through additional molds, and ultimately the strands of steel come out onto runout tables.

In addition to the strand casting, appellant produces ingots through the use of molds. Ingots are conditioned in soaking pits (furnaces) and then sent to blooming mills where they are converted into blooms or billets. These blooms of steel may be further processed to produce steel in sizes and shapes specifically ordered by the customer. This may be done through the use of rolling mills and forging presses. Finishing operations may include heat treatment, straightening, cutting, pickling and shot blasting, drawing, rolling and rough turning. In addition, the appellant uses several methods to inspect its product for quality control.

For purposes of tax payment, Timken reports and pays sales and use taxes to the state of Ohio under a direct payment permit granted by the Tax Commissioner, pursuant to R.C. 5739.031. On April 19, 1979, the Tax Commissioner issued the original notice of assessment, which assessed sales and use taxes, in addition to the amount reported and paid by Timken for the period in question. The assessment involved several hundred different items. Timken filed a petition for reassessment, in accordance with R.C. 5739.13, setting forth its objections to the assessment on approximately four hundred of the items. Following a hearing by a member of the Department of Taxation Hearing Board on the petition for reassessment, the assessment was reduced. Timken then appealed to the Board of Tax Appeals, contesting the assessment on a substantial number of the items, specifically identified in its notice of appeal to the board. At the hearing before the Board of Tax Appeals, Timken withdrew certain items from the appeal and submitted evidence in support of its position with respect to all the rest.

The Board of Tax Appeals found some of Timken's specifications of error were meritorious and ordered those items deleted from the assessment. Otherwise, the Tax Commissioner's final determination was affirmed. The Tax Commissioner was ordered to recompute the assessment and penalty accordingly. It is this decision of the board from which Timken appeals to this court.

The facts concerning the manufacturing operations of Timken are essentially undisputed. Furthermore, the decision of the board does not turn upon findings with respect to the facts, but upon the board's interpretation of the law in relation to undisputed facts and its misapplication of certain principles established in prior cases decided by the courts of Ohio.

## Discussion
### Assignment of Error No. I

Appellant assigns as its first assignment of error the board's determination that certain items of tangible personal property, specifically the emergency ladle system and the heat recuperators, were not purchased by Timken for use directly in the production of tangible personal property for sale, and were therefore not excepted from the sales tax as provided in R.C. 5739.01(E)(2). Based on the following analysis, we sustain appellant's first assignment of error.

## A. *The Emergency Ladle System*

The emergency ladle system is designed to catch any molten steel which escapes from the tundish or the molding pans in case of a failure of some kind, and includes a number of elements. Any steel actually caught in the ladle is taken to the ingot pouring floor and poured into ingots for further processing on Timken's mills. Steel not caught in the ladle drops onto the floor under the emergency ladle and hardens. That material is then recovered and eventually remelted as scrap.

We agree with appellant that the board completely erred in its description of the use of the steel from the emergency ladle. The board stated at page 10 of its decision:

"These *ingots* then constitute 'scrap metal' which form a raw material later inserted and used to form a 'new batch' of molten metal in the furnace where manufacturing begins." (Emphasis added.)

This statement reflects a confusion on the board's part concerning the use of metal poured from the emergency ladle into *ingots* with a *spilled* metal which has to be cut off the floor. Only the *latter* is used in the manner described by the board. The board then concluded, on the basis of its erroneous finding concerning the use of the steel from the emergency ladle:

"The Board finds that the emergency ladle and other items of equipment specifically used to receive, handle and prepare scrap metal to be later introduced, along with other raw materials, into the furnace where steel production begins with the melting of such materials do *not* qualify for the exception from taxation by reason of R.C. 5739.01(E)(2) and (R)."

This finding is factually incorrect and in the end entirely contrary to the undisputed testimony in this case.

The emergency ladle system is used in Timken's steel manufacturing operation at a time after the production of steel has commenced (by melting in the electric furnaces), and before the production has been completed, and thus is used directly in manufacturing. R.C. 5739.01(E)(2) specifically exempts from taxation as a "retail sale" such items used or consumed directly in the production of tangible personal property for sale by manufacturing or processing. The principles of law which determine whether any item is used or consumed "directly in the production of tangible personal property * * * for sale by manufacturing, processing, refining or mining," are well-established. See, *e.g., Consolidation Coal Co.* v. *Kosydar* (1975), 42 Ohio St. 2d 189 [71 O.O.2d 180]; *Canton Malleable Iron Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 163 [59 O.O.2d 178]. Furthermore, the Supreme Court has clearly spoken on the methodology to be used in analyzing these cases:

"It has long been established, in cases dealing with R.C. 5739.01 exceptions to sales and use taxes, that this court will attempt to alleviate the ambiguity inherent in the word 'directly' by endeavoring to make each decision rendered consistent with previous decisions even if the results seem to represent the drawing of artificial boundaries or lines. *Powhatan Mining Co.* v. *Peck* (1953), 160 Ohio St. 389 [52 O.O. 246]. * * *

"If equipment or material is to be excepted under R.C. 5739.01(E)(2) it must be directly involved in the manufacturing process. Manufacturing occurs when there is a 'transformation or conversion of material or things into a different state or form from that in which they originally existed.' *Canton Malleable Iron Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 163, 170 [59 O.O.2d 178]; see also *National Tube Co.* v. *Glander* (1952), 157 Ohio St. 407 [47 O.O. 313], paragraph four of the syllabus. Equipment or material is 'used directly' in

manufacture only if it is 'used or consumed *during and in the manufacturing or processing* period.' *Youngstown Building Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363 [5 O.O.2d 3]; *Consolidated Coal Co.* v. *Kosydar* (1975), 42 Ohio St. 2d 189, 191 [71 O.O.2d 180]. Moreover, for purposes of excepting equipment or material from sales and use taxes under R.C. 5739.01(E)(2), this court will not break up single machines or systems into component parts and segregate such parts into those used directly in production and those that are not. See *Union Carbide [& Carbon Corp.* v. *Bowers* (1957), 166 Ohio St. 419 (2 O.O.2d 403)], *supra,* and *Ohio Ferro-Alloys [Corp.* v. *Bowers* (1960), 171 Ohio St. 283 (13 O.O.2d 271)], *supra.* However, even if equipment or material is used or consumed during the manufacturing period, it may still be subject to use and sales taxes if an agent or medium 'intervenes' between the equipment or material and the manufacturing process. *General Motors* v. *Bowers* (1959), 169 Ohio St. 361, 365 [8 O.O.2d 373]." *Timken Co.* v. *Kosydar* (1977), 52 Ohio St. 2d 131, 134, 136-137 [6 O.O.3d 345].

The standard set out above is often referred to as the "physical" test. This standard is distinguished from one based upon an analysis of the precise function of an item used in manufacturing operations and how it affects the conversion of the material into a finished product.

The Tax Commissioner has adopted a rule to assist in applying these principles which defines further the kind of use which entitles an item to an exemption to the sales or use taxes. That rule is designated as Ohio Adm. Code 5703-9-21 (formerly TX-15-08), which provides in part:

"Persons engaged in the production of tangible personal property for sale by manufacturing, processing, assembling, or refining, may claim exemption when purchasing:

"* * *

"(B) Production machinery, which means any machinery, equipment, or other personal property which acts upon the materials or parts during the conversion of or assembling of the materials or parts into a finished product produced for sale. Production machinery includes machinery, equipment, or other personal property which transports or temporarily stores the materials or parts between stages of conversion or assembling within a plant but does not include any machinery, equipment, or other personal property which transports the materials or parts to the place where the conversion or assembling begins or has no part in the conversion or assembling itself, or which transports the finished product after the finished product is produced and packaged for sale, or which disposes of scrap or waste materials.

"* * *

"(M) Machinery, equipment, and other personal property used to repair or maintain machinery, equipment, and other personal property in (B), (D), (F), (I), (J), (N), and (O).

"* * *

"Articles which are not included within one of the aforementioned classifications shall be presumed to be subject to the tax under the provisions of Section 5739.02 of the Revised Code."

The emergency ladle system clearly constitutes one of the exceptions to the sales and use taxes as developed in the law in Ohio. If there is any doubt as to the correctness of this analysis, the enactment of R.C. 5739.01(S), establishing the "adjunct" concept, removes any doubt. That subsection provides:

" 'Manufacturing' or 'processing' means the transformation or conversion of material or things into a different state or form from that in which they originally existed and, for the purpose of the exceptions contained in division

(E)(2) of this section, includes the adjuncts used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced."

The requirements for an item to be excepted from taxation under this subsection have been established by the Ohio Supreme Court in *Canton Malleable, supra,* at 176-177:

"Subsection (S) demands that the thing sought to be excepted from taxation be (1) an adjunct, (2) used at the same location, and (3) used after the transforming or conversion has commenced. Subsection (E)(2) adds the additional requirement that the thing be adjunct to *direct* use or consumption." (Emphasis *sic.*)

The emergency ladle system fits that definition because it is "used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced."

### B. *The Heat Recuperators*

The heat recuperators sit on top of the furnaces which are used for heating ingots for forging. The recuperators make more efficient use in the furnaces of the heat being generated, recapturing and re-using heat that would otherwise be lost to the atmosphere. It is clear that these recuperators are a part of the furnaces, and are used *in and during* the production process. The ingots being heated are the products of previous operations and there is an intermediate stage before a final product is achieved. The recuperators help to accomplish this reheating in an efficient and economical manner. Applying the principles of law developed in analyzing the emergency ladle system, it is clear that the heat recuperators satisfy the definitions and requirements for an exemption to the sales and use taxes. Any doubt concerning the "direct use" of the recuperators

has similarly been resolved by the adoption of the "adjuncts" concept. They are also "used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced." An analogy can be made between the heat recuperators and the other types of equipment which serve to cool equipment or products, which have been found to be exempt. See *Timken Co.* v. *Kosydar* (1977), 52 Ohio St.2d 131 [6 O.O.3d 345]; *Ohio Ferro-Alloys Corp.* v. *Bowers* (1960), 171 Ohio St. 283 [13 O.O.2d 271]; *Union Carbide & Carbon Corp.* v. *Bowers* (1957), 166 Ohio St. 419 [2 O.O.2d 403].

The board makes no effort to reconcile this portion of its decision with the decisions in the above cases. Such a failure violates one of the fundamental requirements of the law concerning sales taxes. See *Timken Co.* v. *Kosydar* (1977), 52 Ohio St.2d 131, 134 [6 O.O.3d 345]; *Powhatan Mining Co.* v. *Peck* (1953), 160 Ohio St. 389 [52 O.O. 246]. In addition, the board broke up a single machine or system into component parts contrary to the rule that in making the direct use analysis a single machine or system is not to be broken up into component parts. See *Timken Co., supra,* at 137; *Ohio Ferro-Alloys Corp.* v. *Bowers, supra;* and *Union Carbide & Carbon Corp.* v. *Bowers, supra.* As a result, we find the board's decision unreasonable and unlawful.

### Assignment of Error No. II

The gist of the second assignment of error is that the board erred in its determination that the testimony of Timken's tax manager, Mr. Perry, was of no probative value to show that certain items were purchased by Timken for use directly in the production of tangible personal property for sale. The board ruled that Perry's testimony was "of no value for the purpose of establishing entitlement to any sales or use tax exemption," citing *General Mills Fund Group,*

*Inc.* v. *Lindley* (1982), 1 Ohio St.3d 27. Appellant submits that the board's determination was "a devious way of avoiding the application of" a prior decision of this court. See *Timken Co.* v. *Kosydar* (June 30, 1976), Stark App. No. 4347, unreported. Without passing on the board's motivations, we sustain the second assignment of error and find the board's determination to be unreasonable and unlawful.

It is well-established that under R.C. 5739.02, sales are presumed taxable unless proven otherwise, and that the appellant-taxpayer has the burden of proof to show that contested items had, in fact, been transferred to its manufacturing division. Such a transfer to its manufacturing division exempts said items from sales and use taxes. See *Timken Co.* v. *Kosydar* (June 30, 1976), Stark App. No. 4347, unreported. Timken attempted to show such a transfer by testimony of its tax manager. Perry's testimony involved his interpretation of business records of Timken which evidenced the requisite transfer. The board found such testimony to have no probative value, and determined that Timken had not met its burden of proof.

The board's determination is ambiguous at best. Evidence has probative value if it has a tendency to establish the proposition that the evidence is offered to prove. See McCormick on Evidence (3 Ed. Cleary Gen. Ed. 1984) 541, Section 185. Perry's testimony definitely had some tendency to establish the proposition that a transfer had been made. If the board meant to say that Perry's testimony was irrelevant, we similarly find such a determination incorrect. Relevant evidence has two components: materiality and probative value. Perry's testimony clearly not only had probative value but was material. Hence, his testimony was relevant. See, *e.g.,* Evid. R. 401.

The board seemed to base its determination on the fact that Perry's testimony was hearsay. However, hearsay evidence may have a great deal of probative value. Furthermore, hearsay statements are not necessarily unreliable. See Evid. R. 803. The business records which Perry interpreted are clearly admissible hearsay under Evid. R. 803(6), since Perry testified that these records were handled in a manner consistent with Timken's customary business practice. Perry was essentially an expert witness, see Evid. R. 702, whose testimony amounts to an interpretation of Timken's business records, see Evid. R. 604. Thus, Perry's testimony was probative, relevant, and admissible hearsay. In view of the totality of evidence, his testimony clearly establishes that certain items were purchased by Timken for use directly in the production of tangible personal property for sale, and thus merited exception from the sales tax.

We sustain the second assignment of error.

### Assignment of Error No. III

Appellant asserts in his third assignment of error that the board erred in its determination that certain payments made by appellant for labor and for the installation of items of tangible personal property were subject to sales tax as part of the "price" of such tangible personal property under R.C. 5739.01(H). The board pointed out that under this section, if labor or service charges are to be excluded from the calculation of sales tax, those charges must be specifically identified, and that the charges for labor or services "must be reflected on the initial billing rendered by the vendor to the consumer; notations made as to such matter by the consumer upon the billing after it is received from a vendor will not suffice." We rule that the board's determination is unreasonable and unlawful, and we reverse its ruling.

We note at the outset that R.C. 5739.01(H) provides:

" 'Price' means the aggregate value

in money of anything paid or delivered, or promised to be paid or delivered, in the complete performance of a retail sale, without any deduction on account of the cost of the property sold, cost of materials used, labor or service cost, interest or discount paid or allowed after the sale is consummated, or any other expense. *Price does not include the consideration received for labor or services used in installing or applying the property sold, * * * if the consideration for such services * * * is separately stated from the consideration received or to be received for the tangible personal property transferred in the retail sale. Such separation must appear in the sales agreement or on the initial invoice or in initial billing rendered by the vendor to the consumer.* * * * (Emphasis added.)

In the course of its business, Timken frequently contracts with others for the installation of certain items of equipment or facilities in its plants. The installation work is often of an electrical or plumbing nature. Sometimes a contractor is to supply and install a specific item of equipment; in other cases, the contractor is simply directed, by purchase order, to provide all labor and materials necessary for the installation. In the challenged transaction of the case at bar, the contractor submitted a partial bill, completely un-itemized, and then a final billing which gave details concerning the respective charges for labor, materials and other elements of costs. The question presented by these facts is the meaning of the statutory requirement that the charges for labor or services be stated separately "on the initial invoice or initial billing rendered by the vendor to the consumer." The apparent intent of this provision in the statute is that this information be supplied contemporaneously with the performance of the work by the vendor, rather than simply being calculated or estimated in some manner by the consumer at a later date, or even secured by the consumer

from the vendor at a later date in an effort to avoid payment of the sales tax. The contemporaneous presentation of the information provided assurance that the figures are genuine, not imagined or arbitrary. This statute does not deal expressly with a situation where partial billings are rendered on a project of an extended nature.

The provision must be interpreted in light of the basic thrust of the sales tax law, which is to impose a tax on the sale of *tangible personal property,* rather than on *labor* and *services.* There are many similarities between the transactions in question and construction contracts. Construction contracts receive special treatment in the statute pursuant to which tangible personal property is incorporated into an improvement of real property. In those cases, the contractor is considered as the consumer and pays the tax only on the materials. The labor of erecting the structure or improvement is clearly not subject to the tax.

We agree with appellant that the documentation provided in connection with these transactions meets the requirements of the statute for the separate statement of the charges for labor, and that the board erred in not so recognizing. Accordingly, we sustain the third assignment of error.

Assignment of Error No. IV

Appellant argues as its fourth assignment of error that the Board of Tax Appeals erred in its determination that items purchased by Timken for use in the repair or maintenance of other machinery and equipment being used by Timken directly in the production of tangible personal property for sale were subject to the sales tax. Appellant further argues that the board erred in failing to give any effect whatsoever to Ohio Adm. Code 5703-9-21(M), promulgated by the Department of Taxation, in making its determination.

Timken, like all industrial plants, uses many items to repair or maintain the machinery and equipment which performs the various production operations. Timken presented extensive evidence before the board concerning the nature of these various items and the manner they were used for repair or maintenance of production equipment. Appellant argues that such items are clearly exempted under the language of Ohio Adm. Code 5703-9-21(M).

The board in its decision discusses all of the items used for maintenance and repair solely with reference to the case law interpreting the "direct use" provisions of the statute generally. However, none of these cases even discusses items used to repair and maintain production equipment. The board completely ignored Tax Commissioner's rule, Ohio Adm. Code 5703-9-21(M), and obviously failed to give it any consideration. Nowhere does the board find that any of the items being contested by Timken are *not* used for the repair or maintenance of production equipment, as required by the rule. In ignoring the Tax Commissioner's rule, the board has failed to follow the directions of the Ohio Supreme Court pertaining to the legal effect of rules adopted by administrative agencies in enforcing certain laws. See *Kroger Grocery & Baking Co.* v. *Glander* (1948), 149 Ohio St. 120, 125-126 [36 O.O. 471].

For this reason, the decision of the board in this respect is again unreasonable and unlawful.

### Assignment of Error No. V

Appellant argues as its final assignment of error that the board erred in determining that certain transactions in which engineering services were rendered to and paid for by Timken constituted the purchase of tangible personal property rather than personal services transactions in which any transfer of tangible personal property was an inconsequential element. See R.C. 5739.01 (B). Appellant argues that the board completely ignored detailed and extensive evidence concerning each of the transactions in which Timken had employed professional engineers to provide services in connection with a number of projects. In failing to discuss this evidence, the board made no distinction whatsoever among these various projects, with respect to the extent and nature of the services rendered or the magnitude of the project to which they were related. Appellant concludes that the board's decision in this case is harmful to the welfare of the state by discouraging the construction of new plants and the improvement of the existing plants. We agree with appellant's argument and sustain its assignment of error.

It should be noted that Timken has its own engineering division, with a substantial staff, and an engineering department within the steel operations division. Timken employs outside engineering firms to provide engineering services either when the workload is such that its own engineering staff is unable to perform the necessary work, or when it desires to secure a specific expertise which its own engineering staff does not possess. The evidence in the case at bar includes instances of both reasons for securing outside engineering services.

It is clear from the evidence that Timken's true object in employing outside engineers was to secure the *personal, professional services* of the engineers and other personnel on the staff, and not to obtain some tangible end product of that skill and effort. In other words, Timken attempted to obtain the benefit of the experience and expertise of outside engineers, and that the work performed by these engineers was essentially of an intellectual nature, involving the gathering of essential information, analyzing that information and then making recommendations based on

that analysis. The documents which the engineering firms produced were not what Timken attempted to obtain from these firms.

The supposed basis for assessing a sales tax on these transactions was the fact that as a part of the services rendered by the various engineering firms, written reports, specifications, drawings and similar documents were prepared and delivered to Timken. These documents, however, are needed to communicate to others, who are going to make decisions and to carry out the project, information and directions that they can follow in making those decisions and in performing their work. These documents are obviously not the essence of the transaction, the fundamental purpose of which is to obtain the benefit of the skill and knowledge of a trained person to compile necessary information, to analyze that information on the basis of engineering principles, and then to create a design for some tangible object to be constructed or produced. The documents have *no intrinsic value* in and of themselves. They are valuable only because they *communicate* the results of the engineers' or architects' work to others who will convert them into a tangible form. For analogous situations, see *Dun & Bradstreet v. Lindley* (1981), 66 Ohio St. 2d 295 [20 O.O.3d 280]; *Avco Broadcasting Corp.* v. *Lindley* (1978), 53 Ohio St. 2d 64 [7 O.O.3d 145]; *Credit Bureau* v. *Collins* (1977), 50 Ohio St. 2d 270 [4 O.O.3d 439].

The board's interpretation of the statute, which would make transactions like these taxable, would place architects and engineers in a different category from other professionals with respect to the taxability of their services. Accountants and attorneys prepare various documents for their respective clients. Nowhere is it claimed that accounting or legal services should be taxable because of the documents which are created as a result of the professionals' services. This court sees no reason why architects and engineers should be treated differently simply because of the different nature of the documents which they generate and provide to their clients in connection with the services which they render. The delivery of the original document, which is merely the visible form setting forth the results of an intellectual process, is properly regarded as ."an inconsequential element" of the professionals' services which have been rendered. This result is not changed merely because the document under scrutiny is a topographical map. The map is merely the only feasible way of communicating the information compiled by a surveyor. What Timken really obtained was *information*; it did not obtain a map as an item of tangible personal property.

We further hold that the board's reliance on *White Motor Corp.* v. *Kosydar* (1977), 50 Ohio St. 2d 290 [4 O.O.3d 451], is misplaced. *White Motor* does not mandate that any transaction involving engineering services, resulting in some kind of documents which are in turn used to carry out a project, is subject to a sales tax. To do so would be an indirect way of converting a tax on the sales of tangible personal property into a tax on personal services. As appellant notes, "the document 'tail' then ends up wagging the professional service 'dog.'" In addition, it is highly undesirable as a matter of policy for the state to use its taxing mechanism as a means of discouraging the engineering of new plants and other facilities. Such a blind application of the *White Motor* case results in a gross distortion of the sales tax law.

Again, the decision of the board on this aspect of the case is unreasonable and unlawful and is, therefore, reversed.

### Conclusion

For the reasons provided above, we find that the decision of the Board of

Tax Appeals is "unreasonable or unlawful" with respect to all the assignments of error. The board's decision is reversed, and this cause is remanded to that board with instructions to enter an order in conformance with this memorandum-opinion.

*Decision reversed.*

MILLIGAN and TURPIN, JJ., concur.