OAMCO, Appellant, *v.* Lindley, Tax Commr., Appellee.
[Cite as OAMCO *v.* Lindley (1986), 24 Ohio St. 3d 124.]

(No. 85-1114—Decided June 25, 1986.)
(Rehearing allowed July 30, 1986.)

*Knepper, White, Arter & Hadden* and *R. Douglas Wrightsel,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *James C. Sauer,* for appellee.

*Murphey, Young & Smith* and *Joseph C. Winner,* urging reversal for *amicus curiae,* Barber-Greene Co.

*Knepper, White, Arter & Hadden* and *Michael P. Mahoney,* urging reversal for *amicus curiae,* Flexible Pavements, Inc.

*Per Curiam.*   At issue in this case is whether the various parts of the manufacturing process are directly related to, or used in, the manufacture of appellant's product. For the reasons which follow, we affirm in part and reverse in part the decision of the Board of Tax Appeals.

Initially, appellant would have this court adopt the integrated plant theory. This theory views all the components of the manufacturing process as a single unit for tax purposes, and would allow no inquiry beyond whether the whole plant was purchased at the same time. It further implies that every component of the plant is directly used in manufacturing. However, "[t]his theory has never been accepted in Ohio * * *." *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417, 419 [21 O.O.3d 261], citing *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363 [5 O.O.2d 3], and *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113 [63 O.O.2d 195]. The integrated plant theory would prevent a part-by-part analysis, which we think is essential. We therefore do not adopt this theory.

It is readily apparent that equipment used in the manufacturing of products is exempt from sales and use taxes. R.C. 5741.02(C)(2), 5739.01(E)(2), and 5739.02(B)(15) and (16). To qualify for such exemption, a particular component must be "used directly in manufacturing." *Southwestern Portland Cement Co., supra,* at 419, citing *Tri-State Asphalt Corp.* v. *Glander* (1950), 152 Ohio St. 497 [41 O.O. 40]. To determine whether the component is used directly in manufacturing, we must ask, " '*when* does the actual manufacturing activity begin and end * * *.' " *Southwestern Portland Cement Co., supra,* at 421. "Manufacturing" has been statutorily defined to mean, "*transformation or conversion* of material or things into a different state or form from that in which they originally existed and * * * the adjuncts used during and in, and necessary to carry on and continue, production * * *." R.C. 5739.01(R).

In the context of this case, it is readily apparent that the transformation or conversion of material or things into a different state or form occurs primarily in the drum mixer. There, the various ingredients are heated and mixed so that they become the product ultimately sold. However, the manufacture of the product is, in no sense, either initiated or ended in the drum mixer.

As a matter of factual determination, the materials utilized are prepared before they reach the drum mixer. A precise mixing system composed of various small conveyor belts regulates the flow of aggregates from the bins. The result is a uniform size and weight of aggregate, which is essential to the required standardization of product. Likewise, the feed belt conveyor and scale are utilized to regulate the amount of asphalt cement to be added to a particular weight/volume of aggregate. Without these pieces of equipment, there could be no mix specifications, nor constancy of finished product. Without doubt, they are "adjuncts used during and in, and necessary to carry on and continue, production." R.C. 5739.01(R).

The heated main conveyor belt and surge bin are utilized to carefully remove the freshly mixed asphalt from the dryer drum into the trucks. The product, although complete in the dryer drum, is nevertheless not capable of maintaining itself in the form required for delivery. The heated conveyor belt moves the material in small batches to maintain the aggregate consistency. Without this heated equipment, the material would harden after exiting from the dryer drum. Thus, far from merely transporting the product, these machines maintain the product in heated, usable form until delivery. As such, they are crucial for this manufacturing process. Further, in *Hawthorn Mellody* v. *Lindley* (1981), 65 Ohio St. 2d 47 [19 O.O.3d 234], the tax-exempt equipment was for the refrigeration of raw milk and ice cream. Such refrigeration was said to be "essential to prevent spoilage during the processing * * *." *Id.* at 48. The heated main conveyor belt and surge bin are utilized in the very same sense by appellant. Without the heat, and special handling, the asphalt will quickly become an unmarketable, solid mass. Consequently, the equipment utilized to preserve the required product state is an adjunct to property used or consumed directly in the production of tangible personal property. See R.C. 5739.01(E)(2), and *Hawthorn Mellody, supra,* at 49-50.

The unlicensed front-end loading vehicle as well as the holding bins are asserted to be tax-exempt under the holding of *National Lime & Stone Co.* v. *Kosydar* (1974), 38 Ohio St. 2d 206 [67 O.O.2d 228]. In that case, the front-end loading vehicles were utilized to load and blend piles of stone aggregate as part of the processing of raw stone into special sizes of crushed stone. The holding bins were used to keep the materials categorized. *Id.* at 207. In the present case, the same equipment is put to the same use. Also, appellant's finished product similarly requires special mixes of particular sizes of stone. We must therefore conclude that the bins and front-end loader herein were as directly involved in transforming materials into the finished product as the equipment in *National Lime & Stone Co.,* and thus subject to the exemption in R.C. 5739.01(R).

The control house, which functions to control all of the equipment and therefore regulate all variables, is exempted to the extent and in the direct proportion that it controls equipment subject to an exemption. Also, repair parts allocable to exempt equipment are hereby exempted. However, we are unable to find any exception applicable to the truck scales, since they are used outside the manufacturing process.

Accordingly, the decision of the Board of Tax Appeals is affirmed in part and reversed in part.

*Decision affirmed in part*
*and reversed in part.*

SWEENEY, LOCHER, HOLMES and DOUGLAS, JJ., concur.

C. BROWN and WRIGHT, JJ., concur in judgment.

CELEBREZZE, C.J., concurs in part and dissents in part.

WRIGHT, J., concurring. While I agree with the majority's outcome, I would go further and adopt the integrated plant theory. I believe that when all the component parts of a manufacturing plant are indispensable to the production process, the parts should be excluded from Ohio sales and use taxes.

This court has stated that the primary purposes of the manufacturing exemption are: (1) to encourage the production of more valuable tangible personal property for sale by exempting the property used and consumed by the producer in producing such ultimate tangible personal property, and (2) to avoid double taxation. See, e.g., *Bailey* v. *Evatt* (1944), 142 Ohio St. 616, 620 [27 O.O. 534]. The integrated plant theory better serves these purposes than does the physical change theory. Instead of creating an incentive to use modern, efficient systems and machines that enhance economic and industrial growth through improved and effective competition, the physical change theory encourages the use of inefficient plant design and obsolete equipment.

Appellant's manufacturing process for asphalt concrete presents a perfect example of this technological disincentive. The items in the contested assignment are integral parts of appellant's plant and are necessary for the manufacture of asphalt. Appellant owns a "drum mix" plant, which is a sophisticated, cost-effective, continuous production plant. In the less efficient "batch" method of production, a physical change in the product occurs in several components rather than just one. Use of the "batch" method would allow a number of the component parts to be deemed tax-exempt under the physical change theory. Application of this theory to the efficient, integrated "drum mix" method in which the actual physical change occurs in only one component of production will increase the cost of utilizing this new technology. Manufacturers will then be discouraged from utilizing the more efficient, technologically superior plant design.

Further, the physical change theory arbitrarily ignores the importance of particular components of the manufacturing process. Equipment that makes small, relatively unimportant changes in a product is tax-exempt. In contrast, equipment that enables a major change to occur or to be preserved is taxable.

The application of the physical change theory has created unnecessary and inappropriate confusion as to which equipment is or is not exempt. Over the last several decades, the Ohio courts and the Board of Tax Appeals have decided, on a case-by-case basis, whether specific machinery or equipment is ` excluded from Ohio sales and use taxes under this exemption.[1] See, e.g., *Southwestern Portland Cement Co.* v. *Lindley* (1981),

---

[1] A number of courts have criticized the artificial and arbitrary Ohio rule. See *Duval Sierrita Corp.* v. *Arizona Dept. of Revenue* (App. 1977), 116 Ariz. 200, 568 P. 2d 1098; *Courier*

67 Ohio St. 2d 417 [21 O.O.3d 261]; *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113 [63 O.O.2d 195]; *Canton Malleable Iron Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 163 [59 O.O.2d 178]; *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363 [5 O.O.2d 3]. Because each manufacturing process or system is unique, a decision as to where the physical transformation or conversion begins or ends with respect to a certain manufacturing process applies only to that particular process. Very few, if any, of the numerous cases in this area serve as meaningful precedent in determining whether another piece of equipment or machinery is tax-exempt. Many of the decisions are confusing and apparently irreconcilable.[2]

The integrated plant theory is entirely consistent with the literal language of R.C. 5739.01(E)(2) which requires that to qualify for exemption the equipment must be used "directly in the production of tangible personal property * * * for sale by manufacturing." Under the integrated plant theory, all essential and indispensable equipment or components of a manufacturing process are considered to be part of a single, integrated plant and are exempt from sales tax as being used "directly" in the manufacturing process. This theory recognizes that it is simply not practical to break high technology plants into component parts, exempting some parts but taxing others. Today's systems technology must be treated as an integrated whole. Such systems do not lend themselves to piecemeal treatment.

I find no public policy considerations to support the completely artificial definition of manufacturing under the physical change theory. As stated, it provides a disincentive for technological efficiency. It provides no predictable standard of review and necessitates a case-by-case analysis with results that are at best unpredictable. The application of this theory ignores the impracticability of attempting to break a modern-day plant down into component parts. I would instead adopt the integrated plant theory.

C. BROWN, J., concurs in the foregoing opinion.

---

*Citizen Co.* v. *Commr. of Corps. & Taxation* (1971), 358 Mass. 563, 266 N.E. 2d 284; *Floyd Charcoal Co.* v. *Dir. of Revenue* (Mo. 1980), 599 S.W. 2d 173. The great weight of authority throughout the country supports adoption of the "integrated plant" theory. See *Duval Sierrita Corp., supra; Arkansas Beverage Co.* v. *Heath* (1975), 257 Ark. 991, 521 S.W. 2d 835; *Ind. Dept. of State Revenue* v. *Care Stone, Inc.* (Ind. 1983), 457 N.E. 2d 525; *Ames* v. *State Tax Comm.* (1955), 246 Iowa 1016, 71 N.W. 2d 15; *Ross* v. *Greene & Webb Lumber Co.* (Ky. 1978), 567 S.W. 2d 302; *Courier Citizen Co., supra; Niagara Mohawk Power Co.* v. *Wanamaker* (1955), 286 App. Div. 446, 144 N.Y. Supp. 2d 458; *Floyd Charcoal Co., supra; Manitowoc Co.* v. *Sturgeon Bay* (App. 1984), 122 Wis. 2d 406, 362 N.W. 2d 432.

[2] Appellee argues that on analogous facts *Southwestern Portland Cement Co.* and the cases cited therein support the position that no exemption applies. I believe that, to the extent these authorities are in conflict with the "integrated plant" theory, they should be overruled.

CELEBREZZE, C.J., concurring in part and dissenting in part. I am mystified by the majority opinion. On one hand, it professes to reject the integrated plant theory urged by appellant. On the other hand, in a decision which reverses the Board of Tax Appeals in virtually every respect, the majority, in essence, applies the integrated plant theory to reach its desired result.

This court rejected the integrated plant theory in *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417 [21 O.O.3d 261]. There we held that each particular item of property should be examined to determine its qualification for exemption. Equipment used directly in manufacturing is exempt. "Manufacturing" is defined by R.C. 5739.01(R) as the "transformation or conversion of material or things into a different state or form from that in which they originally existed and * * * the adjuncts used during and in, and necessary to carry on and continue, production * * *." Further, R.C. 5739.01(E)(2) requires that to qualify for exemption, adjunct equipment must be used "directly in the production of tangible personal property * * * for sale by manufacturing." In *Southwestern Portland Cement Co., supra,* at 421, we stated as follows:

"* * * The first step of determining when the manufacturing process begins and ends includes a determination of whether the process at issue is an excepted one or one that is preliminary or preparatory to manufacturing. In *Interlake* v. *Kosydar* (1975), 42 Ohio St. 2d 457, 459 [71 O.O.2d 436], this court stated the rule to be '[t]he manufacturing process for which a beginning and end must be determined is the one that produces the marketable product.' See, also, *Ohio Ferro-Alloys Corp.* v. *Kosydar, supra.*

"The second step of determining if the equipment is used 'during and in' manufacturing includes a determination of whether the equipment may be classified as 'adjunct' * * *. In order to except equipment as 'adjunct,' the equipment must be auxiliary to the manufacturing process and it must be used at the same location where the production is occurring, *used after the transforming or conversion has commenced, and be related to direct use or consumption in production.*" (Emphasis added.)

Consistent with the foregoing, a determination can be made for each item involved in this appeal.

The board determined that the drum mixer integral to appellant's plant was exempt as equipment used directly in manufacturing. The majority affirms this exemption and I concur.

The board denied exemption for the feed belt conveyor and Ramsey belt scale used in appellant's operation. The conveyor transports the raw material (aggregate) to the drum mixer and the finished product from the drum mixer. The scale weighs the aggregate before it is introduced into the drum mixer. The majority reverses the board and grants an exemption on the theory that these items are "adjuncts" to the manufacturing process. The majority is simply wrong. Neither of these items is used after the

transformation or conversion process has begun, *Southwestern Portland Cement Co., supra.* Rather, it is obvious that both items are used preparatory to the actual manufacturing in the drum mixer or after manufacture has been completed. Thus, the majority has no basis for reversing the board's decision as to this equipment.

The board also denied exemption for the main conveyor belt and surge bin. These items are used to transport the finished product from the drum mixer and for its storage. The majority again reverses the board and grants an exemption on grounds this equipment was an adjunct to property used or consumed directly in the production of tangible personal property for sale by manufacturing. R.C. 5739.01(E)(2). The majority reasons that the main conveyor belt and surge bin are exempted under our holding in *Hawthorn Mellody* v. *Lindley* (1981), 65 Ohio St. 2d 47 [19 O.O.3d 234]. In *Hawthorn Mellody,* an ice cream manufacturer sought exemption for a refrigerant tank which stored ammonia and two other tanks which stored ice cream flavoring. The refrigerant tank was used to prevent spoilage *during the processing* of milk and ice cream and the other tanks mixed the ice cream with the flavoring *during processing.* Under these facts, this court held that the tanks were an adjunct to property used or consumed directly in production.

The facts of the instant case are entirely different. The main conveyor belt and storage bin are used *after* the processing or manufacture of the asphalt is complete, rather than during the processing stage itself. Neither is directly used in production. Additionally, this court noted in *Hawthorn Mellody, supra,* at 50, that "mere essentiality to the production of tangible personal property by processing is *not* sufficient to satisfy the direct use requirement of R.C. 5739.01(E)(2) * * *." (Emphasis added.) Again, the majority has no basis upon which to grant appellant an exemption for this equipment.

The majority also overturns the board's decision to deny exemption for the front-end loader and storage bins. The majority claims that this equipment is exempt pursuant to R.C. 5739.01(R). How? The front-end loader, storage bins and small conveyor belts are used to combine the raw materials (the aggregates) *prior* to the time these materials are transformed into the hot mix asphalt concrete in the dryer drum. There is no transformation or conversion of these raw materials into a different state or form at the combinational stage. The majority's reliance on *National Lime & Stone Co.* v. *Kosydar* (1974), 38 Ohio St. 2d 206 [67 O.O.2d 228], is misplaced, for in that case the stone mixed by the front-end loaders was used directly in processing to maintain the customer's desired blend, while here the front-end loader is used at a stage preliminary to the change of state or form. The majority's exemption of this equipment is not justified by R.C. 5739.01(R).

The majority again reverses the board and declares that the control house is exempt to the extent that it controls or is allocable to exempt

equipment. This determination essentially allows appellant a second chance to do what the board correctly decided appellant had not done during its appeal. Appellant failed to present to the board evidence of any allocation of control house equipment to non-taxable uses. The appellant has the burden of proving both the manner and extent of the error claimed in its appeal. *Federated Dept. Stores* v. *Lindley* (1983), 5 Ohio St. 3d 213, 215. Appellant failed to establish its right to an exception for the control house in its appeal to the board, yet the majority is now giving appellant another chance at an exemption. Additionally, I agree with the board's determination that those repair parts which are used in conjunction with non-exempt equipment are likewise non-exempt.

Finally, even the majority is unable to find an exemption for the truck scales and I certainly concur.

In conclusion, I wish to add my observation that the board meticulously considered each item of equipment in issue and carefully applied the law of this state as enacted by the General Assembly. Today's decision has abandoned our long-standing tenet not to disturb the board's determinations unless they are found to be arbitrary, unreasonable or unlawful.[3] The majority, for whatever reason, has deliberately and transparently disregarded logic, quashed Ohio's statutes, and repudiated case precedent by substituting its own notion of what this state's tax law should be. Such rewriting of the Tax Code is not, to my knowledge, among the functions of this or any other court.

For the foregoing reasons, I respectfully concur in part and dissent in part.

---

[3] In *Southwestern Portland Cement Co., supra,* at 421-422, we reiterated the standard by which we review the board's factual determinations on appeal:

"In reviewing cases applying R.C. 5739.01(E)(2) and 5739.01(S) [now 5739.01(R)], this court will not overrule board findings of fact which are based on sufficient probative evidence. * * * [Citations omitted.] Moreover, this court has recognized that the Board of Tax Appeals is vested with wide discretion in determining the weight to be given to evidence and the credibility of witnesses, and its determination will not be disturbed absent a showing of patent abuse of discretion."