OAMCO, Appellant, *v.* Lindley, Tax Commr., Appellee.

[Cite as OAMCO *v.* Lindley (1986), 27 Ohio St. 3d 7.]

(No. 85-1114—Decided November 26, 1986.)
(Second rehearing granted — February 2, 1987.)

*Knepper, White, Arter & Hadden* and *R. Douglas Wrightsel,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *James C. Sauer,* for appellee.

*Murphey, Young & Smith* and *Joseph C. Winner,* urging reversal for *amicus curiae,* Barber-Greene Co.

*Knepper, White, Arter & Hadden* and *Michael P. Mahoney,* urging reversal for *amicus curiae,* Flexible Pavements, Inc.

*Per Curiam.* At issue in this case is whether the various parts of the

manufacturing process are directly related to, or used in, the manufacture of appellant's product. For the reasons which follow, we affirm in part and reverse in part the board's decision.

Initially, appellant would have this court adopt the integrated plant theory. This theory views all the components of the manufacturing process as a single unit for tax purposes, and would allow no inquiry beyond whether the whole plant was purchased at the same time. It further implies that every component of the plant is directly used in manufacturing. However, "[t]his theory has never been accepted in Ohio * * *." *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417, 419 [21 O.O. 3d 261], citing *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363 [5 O.O. 2d 3], and *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113 [63 O.O. 2d 195]. While there is much to be said from a public policy standpoint for the integrated plant theory, its adoption would prevent a part-by-part analysis, which we think is essential. Likewise, we reject the commissioner's rigid application of the "direct use" exemption contained within R.C. 5739.01(E)(2).

It is readily apparent that equipment used in the manufacturing of products is exempt from sales and use taxes. R.C. 5741.02(C)(2), 5739.01(E)(2), and 5739.02(B)(15) and (16). To qualify for such exemption, a particular component must be "used directly in manufacturing." *Southwestern Portland Cement Co., supra,* at 419, citing *Tri-State Asphalt Corp.* v. *Glander* (1950), 152 Ohio St. 497 [41 O.O. 40]. To determine whether the component is used directly in manufacturing, we must ask, " '*when* does the actual manufacturing activity begin and end * * *.' " *Southwestern Portland Cement Co., supra,* at 421. "Manufacturing" has been statutorily defined to mean, "*transformation or conversion* of material or things into a different state or form from that in which they originally existed and * * * the adjuncts used during and in, and necessary to carry on and continue, production * * *." (Emphasis added.) R.C. 5739.01(R).

In the context of this case, it is readily apparent that the transformation or conversion of material or things into a different state or form occurs primarily in the drum mixer. There, the various ingredients are heated and mixed so that they become the product ultimately sold. However, the manufacture of the product is, in no sense, either initiated or ended in the drum mixer.

As a matter of factual determination, the materials utilized are prepared before they reach the drum mixer. A precise, computerized mixing system composed of various small conveyor belts regulates the flow of aggregates from the bins. The result is a uniform size and weight of aggregate, which is essential to the required standardization of product. Likewise, the feed belt conveyor and scale are utilized to regulate the amount of asphalt cement to be added to a particular weight/volume of aggregate. Without these pieces of equipment, there could be no mix

specifications, nor constancy of finished product. Without doubt, they are "adjuncts used during and in, and necessary to carry on and continue, production." R.C. 5739.01(R).

The heated main conveyor belt and surge bin are utilized to carefully remove the freshly mixed asphalt from the dryer drum and load it into the trucks. The product, although complete in the dryer drum, is nevertheless not capable of maintaining itself in the form required for delivery. The heated conveyor belt moves the material in small batches to maintain the aggregate consistency. Without this heated equipment, the material would harden after exiting from the dryer drum. Thus, far from merely transporting the product, these machines maintain the product in heated, usable form until delivery. As such, they are crucial for this manufacturing process. Further, in *Hawthorn Mellody* v. *Lindley* (1981), 65 Ohio St. 2d 47 [19 O.O. 3d 234], the tax-exempt equipment was for the refrigeration of raw milk and ice cream. Such refrigeration was said to be "essential to prevent spoilage during the processing * * *." *Id.* at 48. The heated main conveyor belt and surge bin are utilized in the very same sense by appellant. Without the heat, and special handling, the asphalt will quickly become an unmarketable, solid mass. Consequently, the equipment utilized to preserve the required product state is an adjunct to property used or consumed directly in the production of tangible personal property. See R.C. 5739.01(E)(2), and *Hawthorn Mellody, supra,* at 49-50.

The unlicensed front-end loading vehicle as well as the holding bins are asserted to be tax-exempt under the holding of *National Lime & Stone Co.* v. *Kosydar* (1974), 38 Ohio St. 2d 206 [67 O.O. 2d 228]. In that case, the front-end loading vehicles were utilized to load and blend piles of stone aggregate as part of the processing of raw stone into special sizes of crushed stone. The holding bins were used to keep the materials categorized. *Id.* at 207. In the present case, the same equipment is put to the same use. Also, appellant's finished product similarly requires special mixes of particular sizes of stone. We must therefore conclude that the bins and front-end loader herein were as directly involved in transforming materials into the finished product as was the equipment in *National Lime & Stone Co.,* and thus subject to the exemption in R.C. 5739.01(R).

The control house, which functions to control all of the equipment and therefore regulate all variables, is exempted to the extent and in the direct proportion that it controls equipment subject to an exemption. Also, repair parts allocable to exempt equipment are also entitled to an exemption. However, we are unable to find any exception applicable to the truck scales, since they are used outside the manufacturing process.

Finally, we conclude that in view of the strong public policy considerations supporting the finality of judicial and quasi-judicial pronouncements, today's decision shall, with the exception of the subject litigants, only receive prospective application. Accordingly, the validity of other decisions by the Board of Tax Appeals, rendered prior to the date of this deci-

sion, shall not be affected. Accord *Schucker* v. *Metcalf* (1986), 22 Ohio St. 3d 33, 39; *Hoover* v. *Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St. 3d 1, 7. ■

For all of the foregoing reasons, the decision of the Board of Tax Appeals is affirmed in part and reversed in part.

*Decision affirmed in part*
*and reversed in part.*

SWEENEY, LOCHER, HOLMES, C. BROWN, DOUGLAS and WRIGHT, JJ., concur.

CELEBREZZE, C.J., concurs in part and dissents in part.

CELEBREZZE, C.J., concurring in part and dissenting in part. Because the majority opinion remains virtually unchanged upon reconsideration of this cause, I incorporate herein my previous minority opinion published in *OAMCO* v. *Lindley* (1986), 24 Ohio St. 3d 124, 129.

Further, I re-emphasize that the majority's daft ruling is a transparent exercise in judicial legislation. Like the amateur magician who is unable to perform a trick without revealing his sleight of hand, no one in this audience will be fooled by the majority's pretension that it is not adopting the integrated plant theory.[1]

---

[1] The legal reviews are being published with regard to this court's reasoning as espoused in *OAMCO* v. *Lindley* (1986), 24 Ohio St. 3d 124. Because the reasoning in today's decision remains virtually unchanged from that of the original ruling, the following scholarly analysis of that case is pertinent to *OAMCO* then and now:

"* * * The Board of Tax Appeals carefully examined each step in the manufacturing process applying the 'physical change theory' to determine which components were used directly in the manufacturing process * * *.

"Historically, case law has been very careful and precise in determining exactly when a manufacturing process begins and ends, and has only allowed a sales and use tax exemption for items and equipment used directly in the process of conversion after a manufacturing process has begun and before it has ended. The courts have consistently rejected the integrated plant theory *and* examined each piece of equipment and its precise function in the overall process, denying exemption for equipment used prior to or after the actual manufacturing process itself. *The Board of Tax Appeals decided this appeal by scrupulously following Ohio case law on this issue. In this case, however, the high court went well beyond the established boundaries.*" (Emphasis added.) 2 Belden & Schlather, Ohio State Taxation (September 1986), Current Developments, CD2-10.8-10.9, Section 62.03.

Additionally, the writer of this article noted that "the Court concluded that the control house was entitled to exemption to the extent and in the direct proportion that it controls exempt equipment at the plant, *a point on which the taxpayer had failed to introduce any evidence before the Board of Tax Appeals.*" (Emphasis added.) *Id.* at CD2-10.9.

Tax experts are apparently not deceived by the majority's feeble protest that it is not adopting the integrated plant theory in the instant case. In fact, the above commentary is captioned, "Is the Integrated Plant Theory Making a Comeback? [*OAMCO* v. *Lindley,* 24 Ohio St. 3d 124 (1986)]."

The premise of this theory is that the items of property involved are part of an integrated plant and that each item is essential to manufacturing or processing. Adoption of it "would in many instances except from taxation the sales of practically all instrumentalities used by manufacturers or processors, since it could always be said that each instrumentality plays *some* part in the manufacturing or processing." *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363, 367 [5 O.O. 2d 3]. Time and again, this court has wisely rejected judicial adoption of the integrated plant theory because it is based on an interpretation of R.C. 5739.01(R) and 5739.01(E)(2) which has been found to be contrary to the General Assembly's intent. See, *e.g. Bowers, supra; Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113 [63 O.O. 2d 195]; *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417 [21 O.O. 3d 261].

The General Assembly has defined manufacturing, in R.C. 5739.01(R), as "the transformation or conversion of material or things into a different state or form from that in which they originally existed." The Tax Code further provides that adjuncts used directly during and in production after manufacturing has commenced will be exempt from taxation. R.C. 5739.01(R).

In the instant case, the majority exempts equipment in a self-contradictory manner which spurns the mandates of R.C. 5739.01(R) and 5739.01(E)(2). While acknowledging that "it is readily apparent that the transformation or conversion of material or things into a different state or form occurs primarily in the drum mixer," the majority also posits in its statement of the case that "[t]he manufacturing process commences once the taxpayer begins combination of the aggregates," that is, at a stage which is preparatory to the change in state or form which occurs in the drum mixer. There is no way that equipment used exclusively to *prepare* material *prior* to a change in state or form can also be classified as equipment used in manufacturing or an adjunct directly used in the manufacturing process pursuant to R.C. 5739.01(R) and 5739.01(E)(2). By exempting equipment which is used in activities either preparatory or subsequent to the manufacturing process in the instant case, on grounds that this equipment is "essential" or "crucial" to manufacturing, the court has abandoned the statutory "change in state or form" test in favor of one based solely on essentiality. Thus, since it can always be said that each instrumentality is in some way essential to the overall manufacturing process, the majority has junked R.C. 5739.01(R) and 5739.01(E)(2) and gratuitously granted unforeseen and sweeping exceptions to Ohio's Tax Code by rout of judicial enactment. In so doing, the majority has shaken our tripartite system of government by usurping a legislative function.

The framers of Ohio's Constitution vested with the General Assembly the sole power to determine tax exemptions. As Justice Holmes, writing for the court in *State, ex rel. Swetland,* v. *Kinney* (1980), 62 Ohio St. 2d 23, 27 [16 O.O.3d 14], opined, "The General Assembly has 'plenary' power to

determine exemptions from taxation, subject only to the Equal Protection Clause of the Ohio Constitution." Chief Justice Taft's instructive majority opinion in *Denison University* v. *Bd. of Tax Appeals* (1965), 2 Ohio St. 2d 17 [31 O.O.2d 10], concluded at 27 that "the people intended * * * to return to the General Assembly as part of its legislative power 'the general power * * * to determine * * * exemptions' from taxation subject only to the limitations set forth in Article I of the Ohio Constitution, the so-called Bill of Rights. * * *'" Accord *Dayton* v. *Cloud* (1972), 30 Ohio St. 2d 295 [59 O.O. 2d 370], paragraph one of the syllabus.

For nearly twenty years the General Assembly has expressly defined manufacturing, and thus the scope of the tax exemption, by using the change in state or form test now contained in R.C 5739.01(R). The legislature is presumed to be cognizant of our past decisions, which have consistently interpreted and applied this test by exempting equipment only if it is directly used during and in the manufacturing process and not used at a stage either preliminary to or subsequent to a change in the state or form of the material or things. *Bowers, supra; Ohio Ferro-Alloys Corp., supra; Southwestern Portland Cement Co., supra.* Moreover, the General Assembly has, on numerous occasions subsequent to these past decisions, reenacted the statutory change in state or form test without modification.[2] This is a strong indication of the legislature's approval of our judicial interpretation of this statute. As stated in *Doll* v. *Barr* (1898), 58 Ohio St. 113, 121, "[t]he re-enactment of that section without change after that decision, * * * may be accepted as an unqualified recognition of the legislative intention as so judicially declared." Accord *Geiger* v. *Geiger* (1927), 117 Ohio St. 451, 469; *Seeley* v. *Expert, Inc.* (1971), 26 Ohio St. 2d 61, 72-73 [55 O.O. 2d 120]. Clearly the legislature intends that exemptions be determined consistent with the change in state or form test articulated in R.C. 5739.01(R). Unfortunately, today's majority has overridden this legislative intent by declaring that exemptions shall be determined based on the essentiality test central to the integrated plant theory.

It should be remembered that a majority of this court has adopted the integrated plant theory not in response to any constitutional challenge to R.C. 5739.01(R) and 5739.01(E)(2). Nor is there even a hint that the findings of the Board of Tax Appeals, in applying those statutes, were unreasonable or unlawful. Instead, the majority presumes to dictate from the bench the tax policy of this state for no apparent reason other than to substitute its judgment and preference for that of the General Assembly.

This court does not sit in order to write what it considers to be better tax legislation. Rarely should judges substitute their own economic beliefs for the collective judgment of legislative bodies. It bears repeating that we

---

[2] R.C. 5739.01(R) was formerly R.C. 5739.01(S). With the exception of the change of the subsection letter, the statutory definition of manufacturing and processing contained in these subsections is identical.

are not constituted as a "super-legislature to weigh the wisdom of legislation." *Day-Brite Lighting, Inc.* v. *Missouri* (1952), 342 U.S. 421, 423. Nor is it our task "to strike down state laws * * * because they may be * * * out of harmony with a particular school of thought." *Williamson* v. *Lee Optical of Okla.* (1955), 348 U.S. 483, 488.

If there are to be more liberal exemptions for industrial taxpayers under an integrated plant theory, let that decision be made where intended—the General Assembly—and not by this court. The majority's unrestrained substitution of its judgment for that of the legislature is arrogant, lawless, and imposed at great cost to the state treasury.[3]

---

[3] In its memorandum in support of its motion for rehearing of this case, the Department of Taxation estimates that approximately $170 million in state, county and regional transit authority revenue will be lost *annually* if the majority's integrated plant theory is adopted. Surely, if tinkering with the state's tax base is to take place, the modifications should result from the careful deliberative study, hearings and compromise which are hallmarks of the legislative function. Although the integrated plant theory may have merit, only the legislature is equipped to appraise the impact of any change and to enact counterbalancing measures to offset any adverse results. It would take very few *per curiam* opinions of this court to completely thwart the carefully crafted Tax Code of this state.