INTERLAKE, INC., APPELLANT, *v.* KOSYDAR, TAX COMMR.,
APPELLEE.

[Cite as Interlake v. Kosydar (1975), 42 Ohio St. 2d 457.]

(No. 74-634—Decided June 18, 1975.)

*Messrs. Dargusch & Day* and *Mr. Roger F. Day,* for
appellant.

*Mr. William J. Brown,* attorney general, and *Mr. John
C. Duffy, Jr.,* for appellee.

*Per Curiam.* The issue in this case is whether the cok-
ing equipment is excepted from Ohio sales and use taxes.

Appellant contends that the equipment is excepted from the tax by R. C. 5739.01, which reads, in part:

"(E) 'Retail sale' * * * include[s] all sales except those in which the purpose of the consumer is:

" * * *

"(2) * * * to use or consume the thing transferred directly in the production of tangible personal property for sale by manufacturing, processing * * * .

" * * *

"(S) 'Manufacturing' or 'processing' means the transformation or conversion of material or things into a different state or form from that in which they originally existed * * *."

In *R. R. Donnelley & Sons Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 219, 224, 284 N. E. 2d 171, this court said:

"While the addition of the word 'directly' in the 1935 amendment is well known, the importance of the addition of other language is sometimes overlooked. The 1935 amendment did not except from the sales tax all sales where the purpose of the consumer was 'to use or consume the thing transferred directly in manufacturing * * * [or] processing.' Instead, the exception from taxation was limited to sales where the purpose of the consumer was 'to use or consume the thing transferred *directly* in the *production of tangible personal property for sale* by manufacturing [or] processing.' (Emphasis added.)"

In *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113, 115, 296 N. E. 2d 533, the court said:

"For materials or equipment to be excepted under the 'manufacturing exception,' they must be involved in the manufacturing process and that involvement must be direct.

"First, it is necessary to determine the beginning and end of the manufacturing process; anything that is used before or after such process is not within the exception of R. C. 5739.01(E) (2). This court, in *Canton Malleable Iron Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 163, 170, held that 'the terms "manufacturing" and "processing" imply essentially a transformation or conversion of ma-

terial or things into a different state or form from that in which they originally existed—the actual operation incident to changing them into marketable products.' "

In the present case, the "tangible personal property for sale" that is produced by appellant, Interlake, is the merchant pig iron. The manufacturing process for which a beginning and end must be determined is the one that produces that marketable product. The transformation of the raw materials, iron ore, coke and limestone, into the particular article to be sold, merchant pig iron, begins in the blast furnace where they are heated together. See *Jackson Iron & Steel Co.* v. *Glander* (1950), 154 Ohio St. 369, 96 N. E. 2d 21.

This court finds, therefore, that the excepted manufacturing in this case begins in the blast furnace. The coking equipment is involved in " '* * * operations *preliminary* and *preparatory* to manufacturing or processing, and are not used or consumed directly in producing tangible personal property for sale by manufacturing or processing within the contemplation of the applicable statutes, and hence their purchase or use was not excepted from taxation' * * * ." *Ohio Ferro-Alloys Corp.* v. *Kosydar, supra,* at page 117.

Appellant also argues that it is entitled to an exemption under Tax Commissioner's Rule TX-15-08(9), which states:

"Persons engaged in the production of tangible personal property for sale by manufacturing, processing, assembling or refining, may claim exemption when purchasing:

" * * *

" (2) Production machinery, which means any machinery, equipment or other personal property which acts upon the materials or parts during the conversion of or assembling of the materials or parts into a finished product produced for sale.

" * * *

" (9) Machinery, equipment or other personal proper-

ty used primarily to produce nonpurchased gas, water, steam or other products used to operate or to maintain the operating capacity of the machinery, equipment or other personal property in (2), (5), (8), (11) and (12) and fuel for such machinery, equipment or other personal property to the extent that the gas, water, steam or other products so produced are used to operate or to maintain the operating capacity of the machinery and equipment or other personal property in (2), (5), (8), (11) and (12) and equipment which transmits the gas, water, steam or other products to the machinery, equipment or other personal property in (2), (5), (8), (11) or (12)."

The question of the application of TX-15-08(9) to the instant case has been rendered moot by the foregoing determination that the equipment is not excepted from taxation by R. C. 5739.01(E) (2).

*Decision affirmed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE and W. BROWN, JJ., concur.

CORRIGAN and P. BROWN, JJ., dissent.

WILLIAM B. BROWN, J., concurring. The dissenting opinion correctly states that "[u]nless our decision in *Mead* [*Corp.* v. *Glander* (1950), 153 Ohio St. 539] is to be overruled, we must hold herein that Interlake's manufacturing process began when it converted coal to coke in its coke ovens."

When this court decided *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113, I considered the *Mead* decision as being overruled. I join the majority in this case which reinforces that fact *sub silentio.*

PAUL W. BROWN, J., dissenting. Interlake, Inc., has challenged a use tax assessed by the Tax Commissioner of Ohio on repair parts and operating supplies for Interlake's coke ovens and coke handling equipment, and on a conveyor

belt used to convey coke from the coke oven to the blast furnace. The Board of Tax Appeals, in affirming the commissioner's assessment, divided the manufacture of pig iron into steps, and held that only the final step in the process constituted "manufacturing" within the meaning of R. C. 5739.01(E) (2). The majority of this court affirms.

Today's decision marks a clear break with historical and judicial precedent. From its early beginnings in Ohio history, the manufacture of pig iron has begun with the assembling of raw materials, and the conversion of wood to charcoal or coal to coke. Since the inception of sales and use taxes, in the mid-1930's, the parts, supplies, and equipment used in the conversion process have been excepted from taxation.

Now, the Tax Commissioner has assessed, and the Board of Tax Appeals and the majority affirmed, a use tax on just such items, despite the fact that the applicable statutes remain substantially unchanged. I fail to see the rationale behind this departure from past practice, and therefore dissent.

## I

Interlake, the appellant herein, manufactures merchant pig iron at its Toledo, Ohio, facility. Interlake produces some 300 different grades of pig iron, each according to customer order or specification. Prices vary by grade, which are distinguished from one another by their chemical composition.

In manufacturing pig iron, Interlake utilizes three primary raw materials—raw coal, iron ore, and limestone. The coal is crushed and blended into a uniform granular mixture, and charged into coke ovens, where volatile matter is driven off, leaving a 90 percent carbon content residue of coke. This incandescent coke is pushed out of the coke ovens, quenched with water, cooled, crushed to a suitable size, and conveyed directly by conveyor belt to the blast furnace.

One-half hour after the coke is removed from the coke oven, it arrives at the blast furnace. There, coke, iron ore,

and limestone are continuously fed into the top of the blast furnace, where hot air ignites the coke. As the materials gravitate from the top, the ore releases its iron content. The limestone reacts with impurities in the ore and coke to form slag. Molten iron is ultimately tapped from the bottom of the blast furnace into ladles. These ladles are then transported directly to pig casting machines, where 20 and 40 pound pigs are cast into their physical form.

The process herein described, by which Interlake combines coal, iron ore, and limestone to produce pig iron, continues hour after hour, day after day. It was discussed by Mr. Robert Naslund, Interlake's general superintendent, in testimony before the Board of Tax Appeals. Naslund was asked:

"Q. Will you again state briefly how you make these different grades of pig iron?

"A. There is a variety of controls that we employ in changing the chemistry of pig iron, the chemistry being the key with respect to specifications as far as our customers are concerned. We change the amount of coke employed in the blast furnace, producing a particular grade. We change our mix to change the chemistry in the ultimate product. They are blended in the blast furnace to come out with a particular chemistry that we are looking for. We change and alter the temperature of the air that enters into the blast furnace used to oxidize the coke to ultimately form carbon monoxide which is the work horse in the blast furnace, and the key in making pig iron."

Later in the proceeding, Naslund responded to the following questions:

"Q. Without varying the various amounts of carbon in the iron could you actually produce the number of grades you do produce?

"A. No, we couldn't.

"* * *

"Q. Is it possible for you to make pig iron without the use of coke in the process you described?

"A. No, we do not do it."

## II

This appeal presents two major issues for determination: First, whether the conversion of coal to coke is "manufacturing," within the meaning of R. C. 5739.01(E) (2) and (S), and decisions of this court; and second, whether the manufacturing period for producing merchant pig iron begins in the coke ovens with the conversion of coal to coke, or only when the freshly-produced coke is conveyed into the blast furnace.

R. C. 5739.01(E) (2) provides an exception from taxation where the taxpayer's purpose is "* * * to use or consume the thing transferred directly in the production of tangible personal property for sale by manufacturing."

In *National Tube Co.* v. *Glander* (1952), 157 Ohio St. 407, this court defined manufacturing, as used in what is now R. C. 5739.01(E) (2), as "a transformation or conversion of material or things into a different state or form from that in which they originally existed." In 1967, the General Assembly codified this judicial definition (see *Canton Malleable Iron Co.* v. *Porterfield* [1972], 30 Ohio St. 2d 163), defining manufacturing, as used in R. C. 5739.01 (E) (2), as "the transformation or conversion of material or things into a different state or form from that in which they originally existed * * * ." R. C. 5739.01(S).

Without question, the conversion of coal to coke herein constitutes manufacturing within the meaning of R. C. 5739.01 (E) (2).

More critical is the question as to when the manufacture of merchant pig iron begins.

In *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363, this court stated in the syllabus:

"In determining whether tangible personal property is used or consumed directly in the production of tangible personal property for sale by manufacturing or processing, and, therefore, whether its sale or use is excepted from taxation under the provisions of subdivision (E) (2) of Section 5739.01 * * * the test is not whether such property is essential to the operation of an 'integrated plant,' the

test to be applied being, *when* does the actual manfacturing or processing activity begin and end, and is the property used or consumed *during and in the manufacturing or processing period.*"

More recently, in *Canton Malleable Iron Co.* v. *Porterfield, supra,* we stated, at pages 172-173:

"* * * [T]he settled question for determining an exception under R. C. 5739.01(E) (2) turns upon the beginning and ending of the actual transformation or conversion of material into a different state or form from that in which it originally existed. If the primary use or consumption of an item of tangible personal property is made directly in the process of transforming or converting tangible personal property into tangible personal property for sale, then it is excepted from taxation. To be sure, the multitude of cases present diverse factual situations, but for nearly 30 years that basic test has remained unchanged."

In *Mead Corp.* v. *Glander* (1950), 153 Ohio St. 539, that test was applied. The Mead Corporation manufactured white paper from wood and other ingredients. Its operations involved bringing logs into its plant, and storing them for seasoning in a woodyard. In the woodyard, after seasoning, the logs were prepared for reduction into small pieces, cut into smaller lengths, and the bark, branches, and foreign substances removed. All of these steps were "preliminary and preparatory" to the conversion of pulp into paper. Nevertheless, this court held, per Judge Zimmerman, that certain equipment used to convey the wood from the woodyard to other facilities for further processing was excepted from taxation, *because the process of manufacturing the paper began in the woodyard itself.* In *General Cigar Co.* v. *Peck* (1953), 159 Ohio St. 152, we discussed our holding in *Mead,* stating at page 158:

"* * * The woodyard was the place where the first step in preparing wood for reduction to pulp was carried on, which resulted in a material change in the form and size of the wood by use of mechanical means. *This was the first step of the immediate process of transforming wood into*

*paper, and was a part of the process of manufacturing."*

The *Mead* case also involved equipment used to transport wood pulp and other items from a strawshed to beater rooms, where the next succeeding stage of the manufacturing process took place. This equipment was also found to be excepted from taxation, the court stating, at page 543:

"* * * It is the attitude of the board that the locomotive with boxcars was engaged principally in the transportation of materials, including wood pulp from the strawshed to the beater rooms, and that the transportation being solely such, exception from taxation could not be claimed successfully.

"However, the record shows that in the strawshed occurred the selection and loading of pulp of various types as ordered by those in charge of the beater room. It would thus seem apparent that the operations conducted in the strawshed were a step in the preparation and processing of materials for the production of paper, and, this being so, the purchases of the transportation equipment utilized in moving materials upon which processing had begun from one part of the plant to another for further processing would be brought within the exception provisions of the sales and use tax statutes * * *."

The facts in the present case closely parallel those in *Mead*. Mead took raw materials (wood), and changed the state and form of that raw material into a part (wood pulp) of the final product produced for sale (paper). Interlake takes a raw material (coal), and changes the state and form of that raw material into a part (coke) of the final product produced for sale (pig iron). Unless our decision in *Mead* is to be overruled, we must hold herein that Interlake's manufacturing process began when it converted coal to coke in its coke ovens.

This case is clearly distinguishable from those cases in which this court has found certain equipment *not excepted* from taxation. In *V. N. Holderman Paving Co. v. Bowers* (1960), 171 Ohio St. 275, for example, the court held that the manufacture of concrete did not begin until the raw

materials were commingled in a concrete mixer. The court agreed with the Board of Tax Appeals that the addition of water to raw aggregate, prior to its being mixed with concrete in the mixer, was not the beginning of the manufacturing process. The court stated, at page 277:

" '* * * The addition of the water to the aggregate does not transform or convert the aggregate into any different product nor into a different state or form from that in which it originally existed.' "

In *National Tube Co.* v. *Glander, supra* (157 Ohio St. 407), the court held that the manufacture of steel pipe and tubular products did not begin with the unloading of iron ore from a ship or the blending of ore prior to its introduction into blast furnaces. The court stated, at pages 410-411:

"* * * Through these initial movements, no apparent change takes place in the original materials, and by the described operations no actual manufacturing or processing of the materials into finished form ready for sale begins."

In my judgment, the conversion of coal to coke by Interlake clearly complies with the requirements of *Youngstown Bldg. Material* and *Canton Malleable*. Interlake's coal was "used or consumed during and in the manufacturing or processing period." Interlake's coal was used "directly in the process of transforming or converting tangible personal property into tangible personal property for sale." Nothing more is required.

The performance of an essential operation, on a raw material from which an indispensable ingredient is obtained and incorporated as an essential part of tangible personal property which is being produced for sale, should constitute the beginning of the manufacturing process for purposes of sales and use tax exceptions. It is utterly illogical to separate the initial making of component materials or component parts from the rest of the manufacturing process, isolate this activity, and then label it as the production of "preliminary items." In truth, there is nothing whatsoever "preliminary" about the making of coke

herein. It is a vital and integral first step in actually producing the product itself, and no amount of labeling can alter this basic reality.

## III

The majority cites four cases to support its conclusion that the items herein are not excepted from taxation. None are a precedent for today's holding.

In *Jackson Iron & Steel Co.* v. *Glander* (1950), 154 Ohio St. 369, a taxpayer manufactured pig iron for sale and sought an exception from taxation for equipment used in mining the coal, at a location some distance from its manufacturing facility. This court rightly denied the exception, stating, at page 373:

"* * * [I]t can not fairly be said that the mining of coal is a direct and integral part of the production of pig iron. Here, there are two distinct activities, namely, mining and smelting, and, although they are related in that mined coal is utilized in the production of pig iron, the two are still separate and distinct operations."

*Jackson* would be authority for this case if Interlake sought an exception from taxation for machinery used *in mining coal.*

In *Canton Malleable Iron Co.* v. *Porterfield, supra* (30 Ohio St. 2d 163), a taxpayer sought an exception for repair and replacement parts for machinery used to produce sand molds, which molds in turn were used to produce iron castings. This court denied an exception for the repair and replacement parts, stating at page 177:

"* * * In appellee's process, the molds themselves are used directly in the production for sale by manufacturing of iron castings and are clearly excepted from taxation. However, the mold making system, although used 'at the same location' and used after the 'transforming or conversion' has commenced, is not, either by component part or by the whole, adjunct to direct use or consumption in production."

*Canton Malleable* is distinguishable from this case because it involved what was, from 1962 (129 Ohio Laws 1336,

1339) to 1967 (132 Ohio Laws 2308), the "use on use" exemption, that is, a tax exemption for machinery being used, not to transform raw materials into a part of the product produced for sale, but rather to produce still further "machinery" to be used in manufacturing the ultimate product.

*Canton Malleable* merely declined to treat activity, which from 1962 to 1967 qualified for a "use on use" exemption, as excepted from taxation as an "adjunct" to the manufacturing process under R. C. 5739.01(S).

*R. R. Donnelley & Sons Co.* v. *Porterfield* (1972), 30 Ohio St. 2d 219, is also inapposite. It, too, involved the traditional concept of "use on use." There, taxpayer, a publisher, sought an exception for type linecasters used to produce offset printing plates. The plates were then used to produce products for sale—books and telephone directories.

The distinction between *Canton Malleable* and *Donnelley*, and this case, is clear. In *Canton Malleable* and *Donnelley*, machinery was used to produce "machinery," which was used to produce a product. In the present case, machinery was used to produce a product.

Finally, the majority cites *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113, a case the Board of Tax Appeals found "strikingly similar and closely analogous to the case at bar." In that case, Ohio Ferro-Alloys employed "wood hoggers" to chop logs into wood chips, which chips then advanced further through the manufacturing process. In denying an exception from taxation, the court stated, at pages 116-117:

"* * * [T]he *wood chips* are the raw material, not the logs. The 'wood hoggers' merely produce wood chips; they do not convert logs into a final marketable product. It is not the logs that are transformed into the ferro-alloys; rather it is the wood chips that are so transformed. The process by which the 'wood hoggers' convert logs into wood chips is one step removed from the transforming of raw materials into marketable products. This process involves the

preparation of raw materials prior to the commencement of manufacturing. The 'wood hoggers' are involved ' * * * in operations *preliminary* and *preparatory* to manufacturing or processing, and are not used or consumed directly in producing tangible personal property for sale by manufacturing or processing within the contemplation of the applicable statutes, and hence their purchase or use was not excepted from taxation.' *National Tube* v. *Glander* (1952), 157 Ohio St. 407, 411.''

The ''wood hoggers'' in *Ohio Ferro-Alloys* were used to reduce raw materials in size. Interlake undertakes an identical activity—crushing large chunks of coal into a granular state. But Interlake *does not claim* a tax exception for that activity.

Ohio Ferro-Alloys also sought an exception for items used in the operation and maintenance of equipment which weighed and pre-mixed materials prior to their being charged into electric furnaces for the production of ferro-alloys. The court denied an exception, because there was ''not * * * any change in form or state before the materials entered the furnace.''

Herein, Interlake blends three different types of coal prior to introducing the mixture into the coke oven. But this activity is *not* one for which Interlake claims an exception. Rather, Interlake claims an exception for machinery used in the production of coke itself, an activity in which there *is* a change in state or form of the materials.

The majority ably recites broad statements of law to support its conclusion. But the failure of the opinion to examine the law in light of specific fact situations is a fatal deficiency.

IV

Because the majority casts aside judicial precedent and affirms the taxation of equipment and processes not heretofore taxable, it is important to delineate what consequences might flow therefrom.

One wonders, for example, in light of today's decision, whether automobile manufacturers will be taxed on the

equipment and supplies used to produce engines, steering assemblies, and doors, which are merely component parts of automobiles produced for sale. The majority's holding today may compel such a result, in that the manufacture of parts is merely "preliminary and preparatory" to assembly of the whole automobile.

One wonders whether the machinery and equipment used to produce pulp from wood might not be taxable, in that paper, not pulp, is the final stage of production. The majority's holding seems to implicitly overrule *Mead v. Glander, supra,* wherein certain items used to produce pulp were *specifically excepted* from taxation.

Today's decision may well affect industry throughout Ohio, in ways which are now impossible to foresee. That such is to be accomplished by a short per curiam opinion, lacking in substantive factual and legal analysis, is particularly unfortunate.

CORRIGAN, J., concurs in the foregoing dissenting opinion.