SOUTHWESTERN PORTLAND CEMENT COMPANY, APPELLANT, *v.*
LIMBACH, TAX COMMR., APPELLEE.

[Cite as Southwestern Portland Cement Co. *v.* Limbach (1988),
35 Ohio St. 3d 196.]

(No. 86-1852—Decided March 2, 1988.)

*Frost & Jacobs, Dennis J. Barron* and *Larry H. McMillin,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Mark A. Engel,* for appellee.

*Per Curiam.* Exception from the imposition of the sales tax is provided for specified purchases by R.C. 5739. 01(E)(2)[2]:

" 'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

"* * *

"(2) To incorporate the thing transferred as a material or a part, into tangible personal property to be produced for sale by manufacturing, assembling, processing, or refining, or to use or consume the thing transferred directly in the production of tangible personal property * * * for sale by manufacturing, processing, refining,

or mining, including without limitation the extraction from the earth of all substances which are classed geologically as minerals * * *."

For the audit period under review, "manufacturing" or "processing" was defined in former R.C. 5739.01(S):

" 'Manufacturing' or 'processing' means the transformation or conversion of material or things into a different state or form from that in which they originally existed and, for the purpose of the exceptions contained in division (E)(2) of this section, includes the adjuncts used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced."

This definition is a codification of paragraph four of the syllabus in *National Tube Co.* v. *Glander* (1952), 157 Ohio St. 407, 47 O.O. 313, 105 N.E. 2d 648. The later case of *Youngstown Bldg. Material & Fuel Co.* v. *Bowers* (1958), 167 Ohio St. 363, 5 O.O. 2d 3, 149 N.E. 2d 1, provided, in its syllabus, the test to determine whether tangible personal property is used or consumed directly in manufacturing or processing:

"In determining whether tangible personal property is used or consumed directly in the production of tangible personal property for sale by manufacturing or processing, and, therefore, whether its sale or use is excepted from taxation under the provisions of subdivision (E)(2) of Section 5739.01, or subdivision (C)(2) of Section 5741.01, Revised Code, the test is not whether such property is essential to

---

[2] Since R.C. 5741.02(C)(2) excepts from the use tax transactions which would be excepted from the sales tax, only the sales tax will be discussed herein.

the operation of an 'integrated plant,' the test to be applied being, *when* does the actual manufacturing or processing activity begin and end, and is the property used or consumed *during and in the manufacturing or processing period.*" (Emphasis *sic.*)

Thus, to find a manufacturing exception under R.C. 5739.01(E)(2), it must first be determined that manufacturing has occurred (*i.e.,* a transformation or conversion of material or things into a different state or form has taken place). Then, the beginning and end of the manufacturing must be delineated. Finally, it must be decided whether the item under examination was used or consumed directly in manufacturing (*i.e.,* during and in the manufacturing period).

Appellant argues that the BTA's conclusion concerning the beginning of the manufacturing process is not early enough and should begin with the crushing of raw materials. Alternatively, appellant argues that it should be allowed to take advantage of the mining exception under R.C. 5739.01(E)(2) since the limestone and clay it extracts are subjected to further processing. It further argues that manufacturing ends after the product is bagged and palletized, which is much later in time than was found by the BTA, and that manufacturing includes the coal drying operation and water extraction operation. Appellant also argues that it has established that the commissioner abused her discretion in refusing to remit in full the statutory penalty because the commissioner acted contrary to internal tax department standards designed to govern remission requests. Neither party objects to the BTA's description of the items under review. Appellant's major contention is that the case law and statutes were not properly applied to the facts.

We will first consider the quarry-ing operation. At issue are unlicensed quarry vehicles, welding trucks, and quarry haulways material. With respect to quarry vehicles, the equipment under review consists of parts and supplies to maintain these vehicles, which haul blasted limestone from the quarry to a crusher. One truck is equipped with a large steel ball to break up large chunks of limestone. The welding trucks carry equipment used to weld broken production equipment in the quarry area. The quarry haulways material is concrete used to reinforce roads and shoulders damaged by the heavy equipment used in the quarry operation.

The BTA determined that manufacturing began at the kiln and that the quarry operation was not a part of production. It cited *Jackson Iron & Steel Co.* v. *Glander* (1950), 154 Ohio St. 369, 43 O.O. 255, 96 N.E. 2d 21, in rejecting the argument that this property was used in mining, since the quarrying of limestone was not a direct step in producing cement for sale. Regarding the welding trucks, the BTA was not convinced that the primary use of the trucks was direct, since they were used to repair quarry equipment, a pre-manufacturing and, thus, taxable use, and also to repair production equipment during manufacturing, a non-taxable use.

In *Standard Pressed Steel Co.* v. *Lindley* (1980), 62 Ohio St. 2d 268, 16 O.O. 3d 318, 405 N.E. 2d 281, this court considered a "pickling" process which removed mill scale from steel rods that were manufactured into fasteners for sale. The process not only removed mill scale but it reduced the diameter of the rod and also its weight. The court noted the distinction between raw materials which "became integrated by design into the marketable product" (62 Ohio St. 2d at 272, 16 O.O. 3d at 320, 405 N.E. 2d at

284), a situation described in *Mead Paper Corp.* v. *Glander* (1950), 153 Ohio St. 539, 42 O.O. 24, 93 N.E. 2d 19, as contrasted with raw materials that are merely consumed in the manufacturing process but remain in the product, a situation described in *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113, 63 O.O. 2d 195, 296 N.E. 2d 533, and *Interlake* v. *Kosydar* (1975), 42 Ohio St. 2d 457, 71 O.O. 2d 436, 330 N.E. 2d 444. In *Standard Pressed Steel Co.* and *Mead,* the purchase of the equipment that operated on the raw materials that, by design, became integrated into the marketable product was excepted from the sales tax because the equipment transformed the material into a different state or form. In *Ohio Ferro-Alloys Corp.* and *Interlake,* the purchased equipment operated on raw materials that were consumed in the manufacturing process but were not designed to become a part of the product. The purchase of such equipment was not excepted from the sales tax because it was one step away from the transformation of the raw materials into the product.

In the instant case, the raw materials that become cement, limestone and clay are extracted from the quarry owned by appellant. Appellant extracts them from the quarry, transports them to the crushing or grinding operations, and conveys them to the kilns. The limestone and clay become a part of the marketable product by design. In *Jackson Iron & Steel Co.* v. *Glander, supra,* the mined coal at issue was consumed in the production of pig iron, and the mining operation was preliminary and preparatory, much like the "woodhoggers" of *Ohio Ferro-Alloys* and the coking operation of *Interlake.* Exception was denied in *Jackson Iron & Steel Co.* because the coal was merely consumed in the process,

and the mining was not part of producing the final product. Thus, the mining equipment was used preliminarily and preparatory to manufacturing.

Here, there is little doubt that appellant actually begins the transformation of the limestone and clay into cement at the quarry. These materials are blasted from their attachment to the cliff face or scraped from the earth and conveyed to later operations where further transformation takes place. For appellant, manufacturing begins at the quarry. We find that the definition of manufacturing is broad enough to include an operation that traditionally and definitionally may be mining. We regard this operation as the type of operation which the General Assembly sought to benefit when it excepted from the sales tax purchases of equipment used directly in the production of tangible personal property for sale by manufacturing, processing, refining, or mining. *Bailey* v. *Evatt* (1944), 142 Ohio St. 616, 27 O.O. 534, 53 N.E. 2d 812.

The next item to be reviewed is the digital controller. It is used in the operation of the conveyer which carries raw materials to a roller mill. The controller signals to the computer the amount of "feed" going across the scale which measures the raw ingredients. The computer then adjusts feed rates and times. The BTA found that this operation was prior to the beginning of manufacturing, *i.e.,* at the kiln, and denied exception. We find that the digital controller is used during and in manufacturing as an adjunct and grant exception for its purchase. *Ohio Ferro-Alloys Corp.* v. *Kosydar, supra.*

Next we analyze the coal processing equipment, the calorimeter, and the water production equipment. The coal processing equipment dries, crushes, pulverizes, and conveys coal to the kiln where it is ignited to pro-

duce the intense heat necessary to cause the chemical reaction resulting in clinker. The ash of the coal becomes a part of the clinker. The calorimeter is used to test the heating value of the coal at the laboratory. The water production equipment pumps ground water to the Town plant for use in the slurry method. While some of the water is used in the cement cooler and to cool bearings, the BTA found that the primary use of the water is in the slurry mixing process. The water is the medium in which the clay and limestone are mixed, along with other ingredients, for introduction into the kiln.

The BTA determined that the coal processing equipment and the water production equipment were used in a preliminary and preparatory step to manufacturing and denied exception. The BTA found that the calorimeter was not used directly in manufacturing and was not an adjunct.

The coal processing equipment and the water production equipment are similar to the operations involved in *Ohio Ferro-Alloys Corp.* and *Interlake, supra.* In those cases, this court held that equipment which chopped wood into chips and transformed coal into coke, which materials were then consumed in the respective manufacturing operations to fuel the operations, were preliminary and preparatory to manufacturing and not used directly in manufacturing. In this case, coal processing and water production involve preparation of material which is to be consumed in the operation; neither affects a material which becomes a part of the final product by design. The ash of the coal does not detract from the final product, in the instant case, and it is allowed to remain in the clinker. In fact, the sulphur remaining in the ash is problematical to the process. We agree with the finding of the BTA

when it stated that: "* * * [T]he appellant attempts to eliminate or reduce every component of the coal that cannot produce heat. * * * The fact that the ash becomes part of the clinker was not shown to be of any consequence."

The function of the coal is to fuel the chemical reaction producing clinker; the equipment which is under review simply prepares the coal for such consumption. The calorimeter is even more removed as it is used at the laboratory only to test the coal which is to be consumed. The water production equipment simply provides the water which is consumed in the manufacturing. The water is driven off in the heating process. Thus, the equipment which produces it must be said to be preliminary and preparatory to manufacturing.

Next we consider equipment which the BTA found to be used after the end of production. Involved is the silo pumping equipment which blends batches of cement that are too hot or contain too much magnesium for the resulting mixture to meet the standards of the trade, equipment which conveys cement from storage bins to the packaging equipment, and a palletizing machine. The BTA found that manufacturing ends at the point just prior to where the cement is conveyed to the silos, the cement having been ground with gypsum into the final powder form in which it is sold.

Appellant argues that, since twenty-five percent of the Portland cement and all the masonry cement are bagged prior to shipment, and bagged orders are only sold on a wooden pallet, manufacturing is not complete until the cement is bagged and palletized and that all the equipment at issue should therefore be excepted from the sales tax.[3]

---

[3] In *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417, 21

In support of its contention that the blending in the silos is part of the manufacturing process, appellant cites *France Co.* v. *Evatt* (1944), 143 Ohio St. 455, 28 O.O. 381, 55 N.E. 2d 652, and *National Lime & Stone Co.* v. *Kosydar* (1974), 38 Ohio St. 2d 206, 67 O.O. 2d 228, 311 N.E. 2d 899, where this court excepted from the tax equipment used to remove from storage piles selected grades and sizes of crushed stone for shipment to a customer according to the specifications of the customer. In these cases, a shipment nearly always involved the selection of stones from various piles. In the instant case, only occasional blending of like materials occurs, so that the blended material will be of a marketable grade. This only occurs when necessary; if a batch is marketable as stored, nothing further is done except to sell it. There is no transformation into a different state or form. The blending which occurred in *National Lime* and *France* was much more extensive. We agree with the decision of the BTA that manufacturing ends just prior to the point at which the cement is conveyed to the silos. Equipment used after this point is not excepted from the tax by reason of the manufacturing exception. Thus, we also deny exception for the palletizing machine and the equipment which transports cement to bagging.[4]

Finally, appellant asserts that the commissioner failed to observe her own standards for the review of its remission request and that this is an abuse of her administrative discretion. Appellee had reduced the statutorily mandated penalty from fifteen percent to ten percent pursuant to R.C. 5739.13 and Ohio Adm. Code 5703-9-05, and the BTA found appellant's contentions to be without merit. Appellant seeks remission of the total penalty because it achieved high compliance levels.

The scope of our review of BTA decisions is limited to a determination of whether the decision is unreasonable or unlawful. *Frankelite Co.* v. *Lindley* (1986), 28 Ohio St. 3d 29, 28 OBR 90, 502 N.E. 2d 213. Appellant must establish that appellee abused her discretion in not granting a requested remission of the statutory penalty. *Interstate Motor Freight System* v. *Bowers* (1960), 170 Ohio St. 483, 11 O.O. 2d 240, 166 N.E. 2d 229; *Jennings & Churella Constr. Co.* v. *Lindley* (1984), 10 Ohio St. 3d 67, 10 OBR 357, 461 N.E. 2d 897.

The BTA summarily dismissed appellant's contentions concerning its compliance levels. The BTA's decision fails to discuss the evidence presented by appellant or the application of appellee's compliance standards. This is unreasonable and error as no reasons are given for the BTA's decision. We are not satisfied that the BTA completely responded to the question presented to it.

In summary, we reverse that portion of the decision of the BTA which denies exception to the mining and quarrying equipment and reverse its

---

O.O. 3d 261, 424 N.E. 2d 304, this court rejected appellant's contention that the palletizing equipment was part of the packaging operation and denied exemption to it as it was not within the scope of R.C. 5739.02(B)(15).

[4] By enacting R.C. 5739.02(B)(15), the General Assembly acknowledged that packaging occurs after manufacturing has ended. If the packaging operation is regarded as part of manufacturing, as argued by appellant, there is no need for a separate exemption of the packaging equipment from the tax.

decision concerning the digital controller, as it is an adjunct to manufacturing. As to these items, the decision is remanded to the BTA for an order consistent with this opinion. Regarding the remission of the statutory penalty, the decision of the BTA is reversed and remanded to it for reconsideration. The remainder of the decision is hereby affirmed.

*Decision affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., SWEENEY, LOCHER, HOLMES, WRIGHT and H. BROWN, JJ., concur.

DOUGLAS, J., concurs in part and dissents in part.

DOUGLAS, J., concurring in part and dissenting in part. I concur in that portion of the majority opinion that affirms the decision of the Board of Tax Appeals. I respectfully dissent from the portion of the opinion which reverses part of the decision of the Board of Tax Appeals. I would affirm the decision of the Board of Tax Appeals in all respects.

While the case before us involves purchases different from those which this court considered in *Southwestern Portland Cement Co.* v. *Lindley* (1981), 67 Ohio St. 2d 417, 21 O.O. 3d 261, 424 N.E. 2d 304, nevertheless the general guidelines and discussions set forth in that case should be controlling and followed in the case at bar.

Today the majority holds that "* * * manufacturing begins at the quarry." Obviously, no *manufacturing* change takes place in the materials removed by blasting or scraping from the quarry unless and until some other process is engaged in to transform the limestone and clay into cement. Rather than leaving the test so subjective, as the majority does in this decision, as to when the manufacturing process begins and ends, a more objective and readily discernible test would be that manufacturing begins when a change in the chemical properties or in the processes occurs and ends when the transformation has been completed.

The continued chipping away, by this court, at the "manufacturing" or "processing" statute will soon render it completely inoperable and encourage continued and multifarious challenges seeking even greater exceptions from tax which, it would seem by just reading the plain terms of the statute, were not intended by the General Assembly.