**MERCURY MACHINE COMPANY, Appellant,**

v.

**LIMBACH, Tax Commr., Appellee.**

[Cite as *Mercury Machine Co. v. Limbach* (1994), 94 Ohio App.3d 116.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65107

Decided May 2, 1994.

*Conway, Marken, Wyner, Kurant & Kern Co., Keith W. Kern, Jeffrey G. Wyner* and *Peter Turner,* for appellant.

*Lee Fisher,* Attorney General, and *James C. Sauer,* Assistant Attorney General, for appellee.

JAMES M. PORTER, Judge.

Appellant Mercury Machine Company ("Mercury") appeals from the decision and order of the Board of Tax Appeals ("BTA") denying Mercury relief from a sales and use tax assessment by the appellee Tax Commissioner. The BTA denied relief on the grounds that certain computers and computer-related products purchased by Mercury are not exempt from tax because they are not used primarily in Mercury's manufacturing operation to produce tangible personal property for sale. Mercury claims the computers and computer-related products are exempt under R.C. 5739.01(E)(2) and 5739.02(B)(26). For the reasons hereinafter stated, we hold there is merit to the appeal and reverse the decision and order of the BTA.

Mercury manufactures tools and dies used by the aerospace industry, *viz.,* General Electric and Pratt & Whitney, to manufacture blades and vanes for jet engines. These tools and dies are cut from blocks of metal into configurations conforming to the customer's specifications. The system used in this process is highly sophisticated and dependent on extensive use of inter-connected computers. The machines that actually perform the cutting are computer-controlled and are not operated manually.

The Mercury manufacturing system depends on numerical control ("NC") machines that receive codes instructing them how to move in cutting a given product. The NC machines are wired to a digital computer with the trade name "Microvax II," which in turn is wired to a second computer, the Microvax 3600. These Microvax computers are the systems through which the cutting instructions are determined, stored, and relayed to the NC machines which cut the metal.

The Microvax 3600 and the computer work stations, trade-named "Textronix" and "Compaq," which radiate from and connect to the Microvax 3600 are the subject of Mercury's challenge to the Tax Commissioner's assessment at issue on this appeal.

The computer network is completely located within Mercury's single building, but separated by walls in various locations. These machines are all interconnected by an "Ethernet" (computer network) cable, through which they communicate with each other.

Stated generally, the process of machining tools at Mercury is as follows: a particular aerospace customer furnishes Mercury with a blueprint of the blade or vane, which is typically contained on a magnetic tape. This tape is then transferred onto a computer disk. The engineer, working at a work station computer, retrieves the disk when he is ready to analyze the customer's specifications. Specifications vary considerably from product to product; blades in sophisticated aerospace engines are not mass-produced, fungible goods.

These customer-supplied specifications are for the blades themselves and not for the tools which will ultimately make them. Therefore, the specifications cannot be fed directly into the NC systems. Mercury's engineers use the Microvax 3600 computer system and the work station computers to create "instruction sets" which indicate the sequence, speed and direction that the NC machines are to use in creating the specified tool or die.

By utilizing the computer work station, the engineer analyzes the blade design in three-dimensional form generated by the computer and identifies the surfaces that are required for the given tooling. He then produces a computerized image of the tool or die that will be used to cut the particular blade. In making the necessary calculations to develop and adjust the instruction set, the engineer utilizes the Microvax 3600. In order to ascertain that the specifications are accurate, he runs a simulated cutting application on the work station computer, watching an image of a NC machine cutting through the metal. This cutting image is recorded and stored on discs which the Microvax II can later retrieve. This image becomes the basis for the "instruction set" which guides the computerized NC machine as it cuts through the metal stock to specifications.

The computerized NC machines respond only to the "instruction sets." The instruction sets are not sold or reused; they are unique to a given machining job. They are written, viewed and tested on the work station and Microvax 3600 computers before they are transmitted to the Microvax II for storage and then to the NC machine as needed for actual cutting. The instruction sets that are fed to the NC systems are lengthy and detailed, many running twenty pages or longer.

The BTA found that the Microvax II which stored the instruction sets was exempted from taxation as directly used in manufacturing because "the transfer of information from Microvax II and the connected storage disks to the numerical control machines is immediate and necessary in order for the numerical control machines to have the speed and direction required for each cut." However, the BTA found the work station terminals were not exempt because they were used in the "design of appellant's product which precedes manufacturing." The BTA also found that the Microvax 3600 was not used directly with the manufacturing because it performed "the main software processing" and the "number crunching" for tool and die design. Furthermore, they did "not drive or control the operation of the numerical control machines and instead merely serve as a storage component of the design of appellant's product." Mercury challenges the BTA's nonexemption of the Microvax 3600 and its work stations by its timely appeal. Its first two assignments of error will be considered together:

"I. The Board of Tax Appeals erred in finding that the computers (and related goods and services) which are the subject of this appeal are not exempt by statute as goods used primarily in appellant's manufacturing operations to produce tangible personal property for sale under Ohio Revised Code Section 5739.01(E)(2).

"II. The Board of Tax Appeals erred in finding that appellant's computer control systems are 'removed' from the manufacturing process, and thereby are not exempt from sales and use tax."

R.C. 5739.01(E)(2) exempts from taxation the purchase of property for use or consumption directly in the production of tangible personal property for sale by manufacturing. R.C. 5739.01(R), in turn, defines the term "manufacturing" for purposes of the exemption. The audit period at issue herein was January 1, 1986 through December 31, 1988. Prior to March 13, 1987, subsection (R) provided as follows:

"(R) 'Manufacturing' or 'processing' means the transformation or conversion of material or things into a different state or form from that in which they originally existed and, for the purpose of the exceptions contained in division (E)(2) of this section, includes the adjuncts used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced." 141 Ohio Laws, Part I, 1217.

Am.H.B. No. 159, effective March 13, 1987, changed subsection (R) to read:

"(R)(1) 'Manufacturing' or 'processing' means the transformation or conversion of material or things into a different state or form from that in which they originally existed. Manufacturing or processing begins at the point where the transformation or conversion commences, or at the point where raw materials are

committed to the manufacturing process in a receptacle by being measured, mixed, or blended, whichever occurs first, and it ends when the product is completed.

"(2) For the purpose of the exceptions contained in division (E)(2) of this section, things used or consumed directly in manufacturing or processing include the adjuncts used during and in, and necessary to carry on and continue, production to complete a product at the same location after transforming or converting has commenced and before it has ended. Adjuncts include, but are not limited to, machinery and equipment that generates heat or power for production processes and, foundations and supports for machinery and equipment used during manufacturing. Machinery and equipment used before manufacturing begins or after manufacturing ends as described in this division are neither used directly in manufacturing nor as adjuncts.

"(3) For the purpose of the exceptions contained in division (E)(2) of this section, the fact alone that machinery or equipment, supplies, or services are necessary, essential, or crucial to the manufacturing process does not mean they are used directly in the manufacturing process or as an adjunct." 142 Ohio Laws, Part II, 2114.

■ The parties agree that the amendments which codify the case law do not essentially change the definition of "manufacturing" for purposes of the instant appeal. Ultimately, the test for the exemption requires a consideration of the product being produced and the beginning and end of the process which transforms raw materials into the product. *Southwestern Portland Cement Co. v. Limbach* (1988), 35 Ohio St.3d 196, 198, 519 N.E.2d 831, 833–834; *Youngstown Bldg. Material & Fuel Co. v. Bowers* (1958), 167 Ohio St. 363, 5 O.O.2d 3, 149 N.E.2d 1, syllabus.

■ This court's scope of review on appeals from the BTA is limited to determining whether the decision is unreasonable or unlawful. See, *e.g., Southwestern Portland Cement Co., supra,* at 201, 519 N.E.2d at 836–837; *Citizens Financial Group v. Porterfield* (1971), 25 Ohio St.2d 53, 54 O.O.2d 191, 266 N.E.2d 828; *Vogelgesang v. CECOS Internatl., Inc.* (1993), 85 Ohio App.3d 339, 345, 619 N.E.2d 1072, 1076–1077.

In *Libbey–Owens–Ford Co. v. Kosydar* (Nov. 15, 1973), BTA No. B–2, Para. 200–706, the BTA considered the sales taxability of computerized controls which monitored and controlled the manufacture of glass products on computer-controlled machinery. In that decision, the BTA found:

"The computer and television control systems are clearly at least auxiliary to the manufacturing process as they aid in the operations of the furnace, the bath and the lehr, all of which are essential factors in the manufacturing process

* * *. [I]t is the finding of the Board of Tax Appeals that the 1800 IBM Computer with its combined direct control of process and monitoring work is used directly in Appellant's glass manufacturing and that the T.V. monitoring system is clearly an adjunct as that word is used in Revised Code Section 5739.01(S)."

Similarly, in *Owens–Corning Fiberglas Corp. v. Kosydar* (June 29, 1973), BTA No. A–296, Para. 200–643, the BTA addressed the application of the sales and use tax to parts of a computer system that controlled equipment used to manufacture the taxpayer's final product. The BTA quoted from the Ohio Supreme Court's decision in *Ohio Ferro–Alloys Corp. v. Kosydar* (1973), 34 Ohio St.2d 113, 63 O.O.2d 195, 296 N.E.2d 533, which held that a group of recording devices used "for the purpose of controlling the furnace, for the use of human judgment to change the perimeters of the furnace, to make it behave in the way you wish it to behave," were a tax exempt adjunct to the manufacturing. The four-part test to determine whether an adjunct is exempt was set out in *Ohio Ferro–Alloys* as: the item must be: (1) auxiliary or subsidiary to the manufacturing process; (2) used at the location where manufacturing is occurring; (3) used after transforming or conversion has commenced; and (4) related to direct use or consumption in production. *Id.* at 119, 63 O.O.2d at 198–199, 296 N.E.2d at 537–538.

Reasoning that the computer at issue in that case was itself "auxiliary and subsidiary to that equipment that is involved in making glass wool," the BTA in *Owens–Corning Fiberglas Corp.* found that the computer equipment at issue was properly considered "adjunct" to the manufacturing conducted by the taxpayer and therefore not subject to sales tax.

*Minco Tool & Mold, Inc. v. Limbach* (June 29, 1990), BTA No. 88–E–157, Para. 400–699, is virtually identical to the case before us. In *Minco Tool,* the BTA examined equipment very similar to that used in this case. It is surprising to note that the BTA fails to mention or even cite *Minco Tool* in its decision in this case. The facts in *Minco Tool* include the following:

" * * * Appellant's CAD–CAM programmers, working at work-station terminals then devise computer programs for cutting the squared steel blocks into the components of the mold. The programmers input into the CAD–CAM system the dimensions and other data specified on the various drawings. The central computer generates from this data a composite, three-dimensional outline of the mold to be manufactured, called a 'wire frame.' The programmers then referred to this computer-generated wire frame, together with the design drawings, in developing programs of cutting instructions (depths, directions, distances, steel feed rate, tool speeds, etc.) to the NC machines which would mill the mold."

The BTA held that the equipment which prepared the NC machine instructions was exempt under the direct use or manufacturing exception, holding:

" * * * The central computer, work-station terminals and drawings were used on or adjacent to appellant's production line. Further, the primary function of the central computer and the work-station terminals is to operate the NC Machines which cut the components of the molds from steel blocks. The drawings were used primarily for reference by the CAD–CAM programmers who, through the work-station terminals, the central computer and an electronic storage device known as a DNC Link, controlled and directed the cutting operations performed by the NC machines, machine operators and other production workers who manually milled, finished, polished and assembled the molds. Hence, the central computer, work-station terminals and drawings all fit the definition of 'adjuncts to manufacturing,' and are thus exempt. Where property is purchased and used for both exempt and non exempt purposes the primary use to which the property is put is determinative. *Canton Malleable Iron Co. v. Porterfield* (1972), 30 Ohio St.2d 163, 173 [59 O.O.2d 178, 183–184, 283 N.E.2d 434, 440–441]; *A.J. Weigand, Inc. v. Bowers* (1960), 171 Ohio St. 78, 79 [12 O.O.2d 90, 90–91, 167 N.E.2d 772, 773–774]."

In *Minco Tool*, the BTA reversed the final order of the Tax Commissioner. Likewise, reversal is appropriate in the case at bar where essentially the same type of equipment is involved.

In the instant case, the evidence established that the two Microvax computer systems and the work station computers were used to create and store the instruction sets which drive and direct the NC machines. They communicate with each other and with the metalworking machines through an Ethernet cable, as a computer network. Without these instruction sets, the customer-furnished data could not drive the computerized NC machines. Therefore, the instruction sets control the metalworking machines within the meaning of the *Libbey–Owens–Ford, Owens–Corning* and *Minco Tool* cases. As the BTA found in *Minco Tool*, there was "substantial evidence that the drawings [instruction sets] were used throughout its mold manufacturing process by its NC machine operators * * *." So too in the instant case the Microvax 3600 and its related work stations and computer connections developed the instruction sets which were the "brains" that drove the NC machines. We find it incongruous to exempt the storage facility for the encoded disks (the Microvax II) but to find taxable the equipment which is at the heart of the cutting operation.

Therefore, we find that Mercury's Microvax 3600 and its work stations were an adjunct used in and during the manufacturing process and that the decision of the BTA was unreasonable and contrary to law given its own holdings in *Minco Tool.* As the Ohio Supreme Court in *Consumers' Counsel v. Public Util. Comm.* (1992),

64 Ohio St.3d 123, 592 N.E.2d 1370, held, "'Although the [agency] should be willing to change its position when the need therefor is clear and it is shown that prior decisions are in error, it should also respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law.'" *Id.* at 128, 592 N.E.2d at 1375, citing *Cleveland Elec. Illum. Co. v. Public Util. Comm.* (1975), 42 Ohio St.2d 403, 431, 71 O.O.2d 393, 409, 330 N.E.2d 1, 19–20.

Assignments of Error I and II are sustained. It is not necessary to address Assignments of Error III and IV involving the use-on-use exemption in view of our disposition above. These assignments are therefore moot. App.R. 12(A)(1)(c).

The decision and order of the BTA is reversed and the assessment of the Microvax 3600 and related equipment is vacated; the cause is remanded for further proceedings consistent with this opinion.

*Order reversed*
*and cause remanded.*

PATTON, P.J., and JAMES D. SWEENEY, J., concur.