**VOGELGESANG, Cty. Aud., Appellant and Cross–Appellee,**

v.

**CECOS INTERNATIONAL, INC., Appellee and Cross–Appellant.**

[Cite as *Vogelgesang v. CECOS Internatl., Inc.* (1993), 85 Ohio App.3d 339.]

Court of Appeals of Ohio,
Clermont County.

No. CA92–07–077.

Decided March 15, 1993.

340

*Donald W. White*, Clermont County Prosecuting Attorney, and *Elizabeth Mason*, Assistant Prosecuting Attorney, for appellant and cross-appellee.

*Baker & Hostetler, Edward J. Bernert, Daniel J. Gunsett* and *George H. Boerger*, for appellee and cross-appellant.

---

WILLIAM W. YOUNG, Judge.

Appellant and cross-appellee, Gary G. Vogelgesang, Clermont County Auditor ("Auditor"), appeals a decision of the Board of Tax Appeals ("BTA") that determined the taxable value of a now-closed hazardous waste facility owned by appellee and cross-appellant, CECOS International, Inc. ("CECOS"). The tax year in question is 1987 and the applicable tax lien date is January 1, 1987.

The subject property consists of approximately 207.96 acres located at 5092 Aber Road, Williamsburg, Ohio ("the facility"). The facility was composed of a sanitary landfill, administrative buildings, shop and maintenance buildings, a truck wash, leachate[1] storage facilities and eleven secure chemical management facility ("SCMF") cells.[2] As of the tax lien date, Cell Nos. 1–8 were closed,[3] Cell No. 9 was receiving waste and nearly completed, Cell No. 10 had recently started receiving waste, and Cell No. 11 was excavated and under construction. CECOS also planned to construct additional cells, Nos. 12–15.

The facility has a history of intervention by both the Ohio and United States Environmental Protection Agencies ("OEPA" and "EPA," respectively) which we will briefly review. CECOS's parent company, Browning–Ferris Industries, Inc., purchased the facility in 1983. In late 1983, CECOS had to stop the construction of Cell No. 8 due to a sagging side wall caused by water-bearing sand deposits. The OEPA required CECOS to submit a proposal for reconstruction of the failed slope. This failure resulted in a temporary shutdown of the entire facility.

Next, in November 1984, a pumping problem caused water to be discharged from Cell No. 7 into a drainage ditch. The OEPA subsequently closed the facility. The OEPA allowed CECOS to reopen when it agreed to comply with the Final Findings and Orders issued by the Director of the OEPA on November 26,

---

1. Leachate is any liquid, usually rainwater, that has percolated through or drained from hazardous waste. It generally collects at the bottom of a hazardous waste disposal cell.

2. A SCMF cell is a five- to six-acre ground excavation which is used for hazardous waste disposal.

3. A SCMF cell is "closed" when it no longer has space for waste and is covered with a thick cap.

1984. These orders required CECOS to submit plans addressing surface water management and construction of a truck-wash facility.

The OEPA next closed the facility in May 1985 when a hydrogeology study revealed widespread groundwater contamination. The OEPA permitted CECOS to reopen three months later on the condition that a detailed hydrogeologic assessment of the facility would be performed. CECOS's groundwater assessment consultant released its report in May 1986, which confirmed the existence of groundwater contamination. The sources of the contamination were Cell Nos. 1 and 2, which the previous owner constructed, and the intermediate landfill.

CECOS's problems continued in July 1986 when it discovered a large sand deposit or "channel sand" during the construction of Cell No. 11. CECOS also found channel sand in proposed Cell Nos. 12–14. Channel sand is detrimental to the operation of a SCMF cell, as it increases the possibility of water mobility and contamination. As a result of the channel sand discovery, the OEPA, in February 1987, ruled that Cell Nos. 11 and 12 were unsuitable for the disposal of hazardous waste. The OEPA also required Cell Nos. 13 and 14 to be reduced in size.

Also during 1987, the EPA issued an administrative order calling for corrective action at the facility. Specifically, the EPA order forced CECOS to create measures controlling potential releases of contamination and to remediate already contaminated areas.

In August 1988, CECOS voluntarily closed the facility in order to comply with the OEPA's water management requirements. One month later, the facility neared the end of operations as both the OEPA and the EPA denied its "Part B" final operating permit.[4]

Finally, on April 6, 1990, CECOS signed a consent decree with the Ohio Attorney General through which it agreed to permanently close the facility. CECOS also pleaded guilty to one count of violating Ohio's hazardous waste laws and agreed to pay $3.5 million in civil penalties. In addition, CECOS retained liability for closure and post-closure costs and agreed not to transfer the facility to any entity which would engage in hazardous waste operations.

The present case began in 1988 when the Northeastern Local School District filed a complaint with the Clermont County Board of Revision ("board") objecting to the Auditor's valuation of the facility. The Auditor had assessed the facility at

---

4. Prior to the Part B denial, CECOS had been operating its hazardous waste disposal business under the "Part A" interim status authorized by the Resource Conservation and Recovery Act ("RCRA"). See Section 6901 *et seq.*, Title 42, U.S.Code. Once CECOS obtained Part A interim status, RCRA required it to secure a Part B final permit within specified deadlines. Section 6925, Title 42, U.S.Code.

a true value of $1,814,000 and a taxable value of $634,900. The board then reassessed the facility at a true value of $45,246,260 and a taxable value of $15,836,191. CECOS appealed the board's reassessment to the BTA on December 30, 1988.

In its decision, the BTA relied primarily on the report of CECOS's appraiser, William McCann. In his report, McCann first formulated a preliminary estimate of market value "assuming the facility was not defective." McCann's preliminary analysis consisted of two steps. First, McCann utilized the three standard valuation methods, the cost approach, the market approach and the income approach, to compute three estimations of value.[5] Second, McCann reconciled the three figures and, giving the most weight to the market and income approaches, concluded that the facility had a value of $2,150,000 on January 1, 1987, assuming no environmental defects.

To account for what McCann characterized as "defects" at the facility, he then deducted $44,200,000 in estimated liabilities from the reconciled amount and concluded that the facility had a negative value of $42,050,000. The liability deduction included the cost of compliance with the 1984 OEPA Final Findings and Orders, the cost of remediating contaminated Cell Nos. 1 and 2, closure costs, and post-closure costs.

The BTA agreed with McCann's calculation of value until the deduction for liabilities. Finding the liabilities to be speculative, premature costs not incurred as of January 1, 1987, the BTA refused to deduct those amounts from McCann's initial determination of value. Thus, the BTA ruled that the true value of the facility as of January 1, 1987 was $2,150,000, over $43,000,000 less than the board's total.

On appeal, the Auditor presents a single assignment of error:

"The reviewing body abused its discretion to the substantial prejudice of appellant in admitting testimony, over appellant's objection, regarding events occurring two years after the tax lien date where such evidence was offered to demonstrate the value of appellee's real property."

In its cross-appeal, CECOS presents two assignments of error:

Assignment of Error No. 1:

"The BTA erred by failing to determine that the contamination must be utilized to reduce the facility's value as of January 1, 1987."

Assignment of Error No. 2:

---

5. The BTA's decision contains a detailed explanation of McCann's use of the three methods. See *CECOS Internatl., Inc. v. Clermont Cty. Bd. of Revision* (June 12, 1992), B.T.A. No. 88–G–1175. For general explanations, see Ohio Adm.Code 5705–3–03(D).

345

"The BTA erred by failing to consider the impact of pollution control certificates on the value of the facility."

Three basic principles guide our analysis on both the appeal and the cross-appeal. First, it is not the function of an appellate court to substitute its judgment for that of the BTA on factual issues pertaining to the taxable fair market value of property. *Jacob B. Sweeney Equip. Trust v. Limbach* (1991), 74 Ohio App.3d 82, 87, 598 N.E.2d 65, 68. Second, BTA findings of fact that are based upon sufficient probative evidence will not be overruled. *Witt Co. v. Hamilton Cty. Bd. of Revision* (1991), 61 Ohio St.3d 155, 157, 573 N.E.2d 661, 662–663. Third, the revisory jurisdiction of this court is limited to determining whether the decision of the BTA is reasonable and lawful. *Jacob B. Sweeney Equip. Trust* at 87, 598 N.E.2d at 68; R.C. 5717.04.

We first address the Auditor's appeal. In his sole assignment of error, the Auditor contends that the BTA's decision was unreasonable and unlawful because it considered McCann's appraisal report and corresponding testimony in determining value. The Auditor objects to the BTA's use of the report and testimony because they allegedly "substantially rely" on two post-tax lien date events. These events are the OEPA's denial of the RCRA Part B permit on September 8, 1988 and the EPA's denial of the RCRA Part B permit on September 29, 1988.

Real property in Ohio must be appraised at its "true value in money" for taxation purposes. R.C. 5713.01, 5713.03. "True value in money" is defined as follows for purposes of this case:

"The fair market value or current market value of property and is the price at which property should change hands on the open market between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having a knowledge of all the relevant facts." Ohio Adm.Code 5705–3–01(A)(1).

In addition, "[a]ll relevant facts tending to influence the market value of land should be considered, including, but not limited to, size, topography, soil and subsoil, drainage, utility connections, street or road, land pattern, neighborhood type and trend, amenities, zoning, restrictions, easements, hazards, etc." Ohio Adm.Code 5705–3–07(B). The best evidence of the true value in money of real property is an actual, recent sale of the property in an arm's-length transaction. *Conalco, Inc. v. Monroe Cty. Bd. of Revision* (1977), 50 Ohio St.2d 129, 4 O.O.3d 309, 363 N.E.2d 722, paragraph one of the syllabus. In the absence of such a sale, Ohio Adm.Code 5705–3–03(D) allows a true value estimate based on the market, income, and cost approaches to value.

The Ohio Supreme Court addressed the time frame during which the BTA may examine the circumstances affecting property value in *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision* (1981), 66 Ohio St.2d 398, 20 O.O.3d 349,

422 N.E.2d 846. In *Youngstown,* the BTA considered a plant shutdown announcement which occurred approximately nine months after the tax lien date in valuing a steel production complex. The Supreme Court upheld the BTA's valuation, finding that the BTA "must determine value as of the tax lien date" but "cannot ignore events *prior and subsequent to* the tax lien date that affect the true value of the subject property on the tax lien date." (Emphasis added.) *Id.* at 403, 20 O.O.3d at 353, 422 N.E.2d at 850. The Supreme Court found that Youngstown was a "going out of business concern" on the tax lien date and that the shutdown announcement merely "confirm[ed] the inevitable." *Id.* at 404, 20 O.O.3d at 353, 422 N.E.2d at 850. Accordingly, the Supreme Court concluded that the BTA acted lawfully and reasonably in considering the post-lien date shutdown announcement.

In the present case, McCann applied a ten percent probability factor in his cost, sales and income approaches to account for what he felt was the likely chance that the Part B permit would be denied. Essentially, McCann utilized the probability factor in estimating the potential waste disposal capacity of proposed Cell Nos. 13, 14 and 15. These cells were not in existence as of the tax lien date and their functioning depended on a successful Part B application.

This probability factor is at the center of the Auditor's "substantial reliance" argument. The Auditor characterizes the factor as merely the hindsight application of McCann's knowledge that the Part B permit was in fact denied. We view McCann's methods differently, however.

The record indicates that McCann developed his probability factor based on the chronology of events occurring at the facility, both pre-tax lien date and shortly thereafter, not on the Part B denial. For example, McCann testified that he considered post-tax lien date information only "to the extent that it substantially confirmed those indications that were present well before the valuation date." McCann's appraisal report supports this position. McCann listed fourteen "significant factors" in his report, thirteen pre-tax lien date and one post-tax lien date, which would concern a potential buyer. He did not include the Part B denial in this list. The report also stated in several places that McCann analyzed pre-tax lien date events in order to reasonably anticipate post-tax lien date events. Further, McCann applied his probability factor only to the potential disposal capacity in proposed Cell Nos. 13, 14 and 15.

RCRA required CECOS to obtain a Part B permit to lawfully operate the entire facility, not just the proposed new cells. McCann's failure to apply the probability factor to the cells operating under the Part A interim status is consistent with his position that the factor was based on the pre-tax lien date circumstances affecting the facility, not on the Part B denial itself. For the

foregoing reasons, we simply cannot conclude that McCann "substantially relied" on the Part B denial in his appraisal.

■  In addition to our finding that McCann did not substantially rely on the Part B denial, we note that under Ohio Adm.Code 5705–3–07(B), the BTA may evaluate a variety of factors in determining property value. Also, under *Youngstown*, the BTA is authorized to consider post-tax lien date factors, such as the Part B denial, that affect property value.

■  The Auditor attempts to distinguish *Youngstown* on its facts, however. He argues that *Youngstown* does not apply because the facility was not a "going out of business concern" on the tax lien date like the steel production complex in that case and because the Part B denial occurred twenty months after the tax lien date, not nine months like the *Youngstown* shutdown announcement. In *Youngstown*, the court identified the property's substantial losses in the two years prior to the tax lien date in finding that the shutdown announcement merely "confirm[ed] the inevitable."

Although the record fails to show that the facility was a going out of business concern as of the tax lien date, the Part B denial, like the *Youngstown* shutdown announcement, merely confirmed the inevitable. That is, upon review of the pre-tax lien date series of events which occurred at the facility, one could easily conclude that the OEPA and the EPA would deny CECOS's Part B application. As outlined above, the facility had a history of problems including groundwater contamination and significant channel sand deposits. The record indicates that the OEPA and the EPA were concerned about the geological suitability of the site for hazardous waste disposal. In addition, the OEPA and the EPA required CECOS to revise its Part B application on at least three occasions. These facts demonstrate the facility's geological problems and CECOS's inability to comply with the Part B application requirements. Thus, the Part B denial merely confirmed what was fairly obvious at the tax lien date. Also, because we do not read *Youngstown* as announcing a "nine-month rule" for consideration of post-tax lien date factors, the twenty-month gap between the tax lien date and the Part B denial does not render *Youngstown* inapplicable. *Youngstown* is controlling and any reliance by the BTA on the Part B denial is justified.

To summarize, this court finds that the BTA did not act unlawfully or unreasonably in adopting McCann's initial valuation approach, including the probability factor, for three reasons. First, Ohio Adm.Code 5705–3–07(B) allows the BTA to consider a wide range of factors in determining property value. Second, McCann relied on the chronology of events occurring at the facility, not the Part B denial itself, in determining the probability factor and taxable value. Third, any consideration of the Part B denial by the BTA was proper as the

denial merely confirmed the outcome easily predicted from the geological problems at the facility and from CECOS's difficulties in the application process. For these reasons, the Auditor's sole assignment of error is overruled.

We now turn to CECOS's cross-appeal. In its first assignment of error, CECOS calls into question the BTA's failure to adopt McCann's deductions for the costs associated with environmental contamination and regulatory compliance. Again, McCann deducted these costs in calculating a negative value of $42,050,000 as of January 1, 1987. The BTA found that the deductions were speculative, premature, and improper.

Specifically, McCann deducted the following costs from his initial determination of value:

| | |
|---|---:|
| Compliance with 1984 OEPA Final Findings and Orders | $ 5,730,837 |
| Remediation of Contaminated Cell Nos. 1 and 2 | 3,207,740 |
| Closure of Structures in Existence Prior to Tax Lien Date | 1,885,310 |
| Thirty Years of Post–Closure Care | 33,379,481 |
| | $44,203,368 |

We address each category of costs separately.

■ First, pursuant to the Final Findings and Orders issued in 1984, the OEPA required CECOS to build several structures at the facility to prevent groundwater contamination. These structures included additional monitoring wells, a diversion swale, potentially contaminated water storage facilities, an integrated surface water management system, a tank farm, and a truck-wash facility.

This court cannot conclude that the BTA's refusal to deduct the costs associated with the 1984 Findings and Orders was unlawful or unreasonable. Constance Dall, CECOS's former controller and current special projects manager, testified that these costs were incurred after the tax lien date. Dall also testified that the $5,730,837 figure which McCann relied upon was a current estimate calculated by CECOS for purposes of his appraisal. Additionally, McCann simply deducted CECOS's estimate of compliance costs from his initial valuation. He failed to indicate in the appraisal or in his testimony the effect that these costs had on the facility's value as of January 1, 1987. Further, the BTA was not obligated to adopt McCann's deduction for the cost of compliance with the 1984 orders as it is "not required to adopt the appraisal methodology espoused by any expert or witness." *Youngstown, supra,* 66 Ohio St.2d at 403, 20 O.O.3d at 353, 422 N.E.2d at 849. For these reasons, the BTA did not err in finding this particular deduction from value premature and improper.

The remediation costs for contaminated Cell Nos. 1 and 2 present a more difficult question. Courts have struggled with the problem of determining the effect that the costs of cleaning up environmental contamination have on property value for tax purposes. See *Inmar Assoc., Inc. v. Borough of Carlstadt* (1988), 112 N.J. 593, 549 A.2d 38; *Appeal of Great Lakes Container Corp.* (1985), 126 N.H. 167, 489 A.2d 134.

CECOS urges us to adopt the Michigan Tax Tribunal's approach to this complex issue. That tribunal concluded that real property has a nominal value and is unmarketable when the estimated contamination cleanup costs exceed the reasonable value of a comparable uncontaminated site. See *Comerica Bank–Detroit v. Metamora Twp.* (May 12, 1989), Mich.Tax Trib. Docket Nos. 103325, 110482, 112529, 1989 WL 56531; *Bielat v. Macomb Twp.* (Oct. 7, 1987), Mich.Tax Trib. Docket Nos. 93707, 93709, 93939, 95702; *Community Consultants v. Bedford Twp.* (1985), 3 Mich.Tax Trib.Rep. 593. Despite these Michigan decisions, we are not prepared to conclude that the facility had a nominal value as of the tax lien date.

■ CECOS has the burden or proving that it has a right to a reduction in taxable property value. *Renner v. Tuscarawas Cty. Bd. of Revision* (1991), 59 Ohio St.3d 142, 572 N.E.2d 56. In his appraisal, McCann simply subtracted a discounted version of the cost of cleaning up Cell Nos. 1 and 2 from his initial valuation. As with the compliance costs discussed above, CECOS estimated the cleanup costs for purposes of McCann's appraisal.

■ The deduction for cleanup costs may reflect the effect that these costs had on CECOS's profitability, but it fails to demonstrate their effect on the facility's property value as of January 1, 1987. We feel that the New Jersey Supreme Court has correctly assessed McCann's approach to valuing contaminated property:

"One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property. That would reflect only the cost accounting practices of the current owners. * * * Simply because cleanup costs will affect the owner's profits does not, however, automatically require a reduction in the tax assessment." *Inmar, supra,* 112 N.J. at 605, 549 A.2d at 43–44.

In addition, the taxpayer "cannot avoid the cost of cleanup, but cost is not invariably equated with value." *Id.* at 602, 549 A.2d at 42. Because McCann's appraisal merely deducts the cleanup costs from the initial valuation and does not indicate the effect that these costs had on the facility's 1987 value, CECOS did not carry its burden on this issue. Accordingly, the BTA did not act unlawfully or unreasonably in refusing to deduct the contamination costs.

■ McCann's third deduction corresponds to the closure costs estimated for several structures in existence at the facility as of the tax lien date. "Closure" refers to the physical closing of a hazardous waste management unit. It is required by RCRA and must be approved by the OEPA. Closure essentially prepares the unit for the post-closure maintenance period and includes landfill or surface impoundment, backfilling, capping, and seeding. The closure cost figure which McCann applied is composed of the closure estimates for three fireponds, the old drum holding area, the interim truck wash, and other portions of the facility.

Although these units were in existence as of the tax lien date, the cost estimates McCann utilized were prepared just before the October 1991 BTA hearing and were discounted back to January 1, 1987. John Hart, CECOS's environmental affairs manager, testified that he prepared the figures, which are "expenditures we expect to expend for the closure plan submitted to the agency." Hart also testified that the OEPA has not approved any of the closure plans submitted by CECOS for the aforementioned disposal units. CECOS first began submitting closure plans as early as 1985 and, as of the BTA hearing, had yet to have one approved.

Because the OEPA had not approved any of the closure plans, Hart could not determine when closure would actually begin. Hart further testified that he did not consider the closure estimates which CECOS had on record as of the tax lien date, which, as evidenced by CECOS's response to the Auditor's request for the production of documents, were significantly lower than the estimate used by McCann. Based on these facts, we cannot conclude that the BTA's refusal to deduct the closure costs was unlawful or unreasonable.

■ Finally, McCann deducted over $30 million to cover thirty years of post-closure care. The post-closure period includes environmental monitoring, maintenance and inspection and is a regulatory responsibility of ownership. Like the deduction for closure costs, the deduction for post-closure costs is an estimate current as of the October 1991 hearing date, which McCann discounted back to the tax lien date. McCann, though, made no effort to amortize the total over a thirty-year period. Also, Gary Saylor, the facility's interim district manager, testified that the post-closure costs had not been incurred as of the tax lien date and that a portion of the costs had not even been budgeted for until 1990. Further, as the OEPA had not adopted CECOS's closure plans, it follows that the post-closure cost deductions would be speculative and premature. For the foregoing reasons, the BTA's refusal to deduct the post-closure costs from McCann's initial valuation was not unlawful or unreasonable.

Because this court finds that the BTA had sufficient probative evidence to conclude that McCann's liability deductions were speculative, premature and improper, CECOS's first assignment of error on cross-appeal is overruled.

■ In its second assignment of error on cross-appeal, CECOS argues that the BTA erred by not considering the tax exemptions resulting from CECOS's pollution control certificates in its valuation of the facility. We disagree.

R.C. 6111.34 authorizes a real property tax exemption for water pollution control facilities certified by the OEPA. Once the OEPA issues an industrial water pollution control certificate, it is retroactive in effect:

"The effective date of such certificate shall be the date when the item or items described therein are acquired or when title to or possession of such item or items is first transferred to the applicant or when construction of any structure or structures enumerated therein begins, whichever is earlier * * *." R.C. 6111.31.

On November 20, 1989, the OEPA issued industrial water pollution control certificates for Cell Nos. 8 and 9. An OEPA hearing examiner, on March 29, 1991, also recommended that a certificate should issue for Cell Nos. 10 and 13, a tank facility, and a wash station. On March 13, 1992, the OEPA appealed the certificate relating to Cell Nos. 10 and 13 to the Environmental Board of Review ("EBR"). The EBR has yet to resolve this appeal. Because the status of the latter certificate is not final, we address only the certificates issued for Cell Nos. 8 and 9.

CECOS's position is that because the effective dates of the certificates for Cell Nos. 8 and 9 are July 11, 1983 and July 15, 1984, respectively, the corresponding tax exemptions must be factored into the facility's value. CECOS has failed to cite any statutory or judicial authority to support this proposition, however. In addition, CECOS has not demonstrated that it properly applied for a tax exemption with the Tax Commissioner pursuant to R.C. 5713.08. Such an application must include a certificate executed by the county treasurer certifying that either all taxes, assessments, interest, and penalties corresponding to the property sought to be exempted have been paid in full or that a valid undertaking has been entered with the county treasurer regarding delinquent taxes, assessments, interest, and penalties. R.C. 5713.08(A). This process suggests that when an exemption is granted post-tax lien date, the correct procedure is to apply for a refund of real property tax. Therefore, we do not feel compelled to grant CECOS a deduction from the BTA's taxable value determination for the pollution control exemptions. The BTA's failure to address the exemptions was not

unlawful or unreasonable and CECOS's second assignment of error on cross-appeal is overruled.

*Judgment affirmed.*

JONES, P.J., concurs.

KOEHLER, J., concurs in part and dissents in part.

KOEHLER, Judge, concurring in part and dissenting in part.

I concur with the majority opinion on the appeal; however, I would reverse the BTA ruling on disallowance of appellee and cross-appellant's deductions for expenses incurred or to be incurred as a result of the Final Findings and Orders issued by the OEPA in 1984 to prevent groundwater contamination. The costs, whatever they might be, were a factor affecting the taxable value of the property in 1987. The BTA, in the absence of any testimony contra, chose to deny appellee and cross-appellant's diminution of value for tax purposes. Such denial was without sufficient evidence to support it.

The closure costs which appellee and cross-appellant presented, although prepared subsequent to the tax year involved, were properly discounted and should have been allowable deductions for determining the taxable value of the property in 1987.

Following the Michigan rule, the cleanup cost is a factor which must be considered in determining the tax valuation of the property. If the denial of the Part B application merely confirmed that which was fairly obvious at the tax lien date for ruling upon the appeal, the same position must be taken on the closing cost on the site as they could be properly determined on remand to the BTA for that purpose.

If all proper deductions were allowed, the tax valuation would be minimal.

Accordingly, I dissent from the majority's disposition of the cross-appeal.